[No. B194088. Second Dist., Div. Four. Feb. 1, 2008.]

NYGÅRD, INC., et al., Plaintiffs and Appellants, v.
TIMO UUSI-KERTTULA et al., Defendants and Respondents.

COUNSEL

Seyfarth Shaw, Todd C. Hunt and Daniel Hargis for Plaintiffs and Appellants.

Carlsmith Ball, Malcolm S. McNeil and Ole R. Sandberg for Defendants and Respondents.

OPINION

SUZUKAWA, J.—After terminating his employment with plaintiffs Nygård, Inc., and Nygård International Partnership (collectively, the company or plaintiffs),[1] defendant Timo Uusi-Kerttula (Timo) gave an interview about his work experiences to a Finnish magazine, defendant Katso Magazine (the magazine). Plaintiffs sued Timo, the magazine, and its publisher for a variety

---

[1] Peter Nygård (Nygård), who is not a party to this action, is the company's chairman and founder.

of tort and contract claims, including breach of employment contract and defamation. The trial court struck the entire complaint pursuant to the anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16.[2] We find that the anti-SLAPP motion was properly granted, and we affirm.

## FACTS AND PROCEDURAL HISTORY

Timo ceased working for the company in 2005. Subsequently, he gave an interview to the magazine, then owned by defendant A-Lehdet (the publisher). The magazine published an article based on the interview in June 2005 (the June 2005 article). In it, Timo claimed that while working for the company, he " 'slaved . . . without a break,' " endured " 'pestering/taunting round the clock,' " had to " 'slave/drudge almost without a break the whole time,' " and felt himself " 'used.' " Further, he said, Nygård wanted him to " 'work round the clock,' " " 'keeps an eye on his workers like a hawk,' " and " 'didn't want to let his employees to even go and see a doctor' " when injured. Finally, he revealed that dancer Aira Suvio-Samulin and her granddaughters were Christmas guests in Nygård's home in the Cayman Islands.

On October 26, 2005, the company filed a complaint against Timo, the magazine, and the publisher for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with contract, breach of the duty of loyalty, and defamation. The complaint alleged that Timo intentionally revealed the company's confidential information in violation of express and implied contractual duties; that Timo and the magazine made false and disparaging statements about the company that exposed it to "hatred, contempt, ridicule, and obloquy"; and that the magazine interfered with the contractual relationship between Timo and the company by "soliciting [the company's] confidential information in order to defame and otherwise damage [the company]."

Timo, the magazine, and the publisher (collectively, defendants) filed anti-SLAPP motions to strike the complaint pursuant to section 425.16 on June 26, 2006. They contended that the June 2005 article concerned public figures and addressed issues of public interest; there was no evidence that the statements were false or were made with actual malice; neither the confidentiality agreement executed between Timo and the company, the implied covenant of good faith and fair dealing, nor the duty of loyalty prevented

---

[2] All further undesignated statutory references are to the Code of Civil Procedure.

Timo from speaking about the company's working conditions; and there was no evidence that the publisher knew about the confidentiality agreement when it published the article. Thus, they asserted, the complaint should be stricken under the anti-SLAPP statute.

The court granted the motions to strike on July 19, 2006. According to the court, in resolving a special motion to strike, "the trial court must engage in a two-step analysis: first, has the defendant shown that the challenged causes of action arise from, *e.g.*, 'free speech in connection with a public issue or an issue of public interest,' and second, has the plaintiff demonstrated that it can probably prevail on the claim." The court found that defendants met the first prong of the test because their evidence showed that the company and its founder, Nygård, "are internationally known public figures who spend a great deal of money and effort to promote their business, success, wealth and lifestyle." Further, plaintiffs employ over 12,000 employees worldwide. Thus, the court said, the statements made by Timo and published by the magazine involved highly visible public figures and issues of public interest.

Accordingly, the court said, the burden shifted to plaintiffs to show that they would probably prevail at trial on their various causes of action. The court concluded that plaintiffs failed to meet their burden. First, while plaintiffs' declarations characterized some of Timo's statements as "inaccurate," "what they really provide is the individual employment experience of these four employees and their opinions about Nygård's working conditions. These different personal experiences do not render Timo's statements false or defamatory." Second, plaintiffs' declarations failed to establish actual malice as required to prevail in a defamation cause of action against a public figure. Third, the court concluded that plaintiffs could not establish their causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, or breach of the duty of loyalty because Labor Code section 232.5 prohibits employers from requiring employees to "refrain from disclosing information about the employer's working conditions." Thus, regardless of the terms of Timo's employment contract, Timo was free to speak about his working conditions. Finally, plaintiffs' evidence did not even attempt to show that plaintiffs could probably prevail on their claim of intentional interference by the publisher and the magazine.

Defendants served notice of ruling on the anti-SLAPP motions on July 27, 2006. Plaintiffs timely appealed.

## DISCUSSION

### I. *The Anti-SLAPP Statute and the Standard of Review*

■ A special motion to strike under section 425.16—the so-called anti-SLAPP statute—allows a defendant to seek early dismissal of a lawsuit that qualifies as a SLAPP. "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) A SLAPP is "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such an act includes "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

A SLAPP is subject to a special motion to strike "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Thus, evaluation of an anti-SLAPP motion requires a two-step process in the trial court. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695]; see *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 946 [59 Cal.Rptr.3d 48].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a

SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1056 [18 Cal.Rptr.3d 882].) We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30]; see *Kronemyer v. Internet Movie Database Inc.*, *supra*, 150 Cal.App.4th at p. 946.)

## II. *Protected Activity*

As we have noted, the defendant in an alleged SLAPP suit bears the initial burden of showing that the suit falls within the class of suits subject to a motion to strike under section 425.16. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 304 [106 Cal.Rptr.2d 906].) A defendant meets this burden by showing that the acts underlying the plaintiff's cause of action fall within one of the four categories of conduct described in section 425.16, subdivision (e). (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1569 [31 Cal.Rptr.3d 368].)

For the reasons that follow, we conclude that the statements at issue in this case come within section 425.16, subdivision (e)(3)—i.e., they are "written or oral statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest." Accordingly, the trial court properly found that this suit arose out of activity protected by the anti-SLAPP statute.

### A. *Public Forum*

■ To be protected by section 425.16, subdivision (e)(3), the statements on which a suit is based must have been made "in a place open to the public or a public forum." A "public forum" traditionally has been defined as a place that is open to the public where information is freely exchanged. (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475 [102 Cal.Rptr.2d 205].)

The Courts of Appeal have disagreed whether a newspaper or magazine is a "public forum" within the meaning of section 425.16, subdivision (e)(3). *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855 [44 Cal.Rptr.2d 46] (*Lafayette Morehouse*) is typical of the cases that have held that newspapers and magazines are not public fora. There, the court explained that newspapers are not public fora because members of the public cannot freely publish their opinions in them: "No authorities have been cited to us holding a newspaper printing allegedly libelous material is a 'place open to the public or a public forum.' Newspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' " (*Id.* at p. 863, fn. 5.) *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130 [2 Cal.Rptr.3d 385] (*Weinberg*) reached a similar result, concluding that "Means of communication where access is selective, such as most newspapers, newsletters, and other media outlets, are not public forums." (See also *Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1131 [55 Cal.Rptr.2d 909], disapproved on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1124 [81 Cal.Rptr.2d 471, 969 P.2d 564] [adopting *Lafayette Morehouse* analysis].)

Other courts have disagreed, concluding that newspapers and magazines are public fora because the opinions they express are readily available to members of the public and contribute to the public debate. In *Damon v. Ocean Hills Journalism Club, supra*, 85 Cal.App.4th 468, 476–477, for example, the court held that the Village Voice, a homeowners association newsletter, was a public forum: "The Village Voice was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community. All interested parties had full opportunity to read the articles in the newsletter. Although the Village Voice newsletter may not have offered a 'balanced' view, the Association's other newsletter—the Board's official newsletter—was the place where Association members with differing viewpoints could express their opposing views. It is in this marketplace of ideas that the Village Voice served a very public communicative purpose promoting open discussion—a purpose analogous to a public forum. Given the mandate that we broadly construe the anti-SLAPP statute, a single publication does not lose its 'public forum' character merely because it does not provide a balanced point of view." (See also *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1161 [15 Cal.Rptr.3d 100] [letter to editor published in Gay and Lesbian Times was made in a public forum: "This court has concluded that a news publication is a 'public forum' within the meaning of the anti-SLAPP statute if it is a vehicle for discussion of public issues and it is distributed to a large and interested community."]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 896–897 [7 Cal.Rptr.3d 497] [single-source Web site

was a public forum: "In our view, whether a statement is 'made in a place open to the public or in a public forum' depends on whether the means of communicating the statement permits open debate. We agree that [defendant's] Web site—and most newspapers—are not public forums in and of themselves. It does not follow, however, that statements made on a Web site or in a newspaper are not made in a public forum. Where the newspaper is but one source of information on an issue, and other sources are easily accessible to interested persons, the newspaper is but one source of information in a larger public forum."].)

 We conclude that newspapers and magazines are public fora within the meaning of section 425.16, subdivision (e)(3). As an initial matter, we note that subdivision (e)(3) provides that a written statement is within the anti-SLAPP statute if it is made *either* in "a place open to the public" *or* "a public forum." (§ 425.16, subd. (e)(3).) Under well-established principles of statutory construction, we must " 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose' " (*In re Y.R.* (2007) 152 Cal.App.4th 99, 109 [60 CAl. Rptr. 3d 820], quoting *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323]), avoiding an interpretation that " ' "renders a part of the statute . . . 'surplusage' " ' " (*Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 114 [36 Cal.Rptr.3d 1]). Accordingly, a "public forum" cannot be synonymous with "a place open to the public"—if it were, the Legislature would not have defined the categories of protected speech in the disjunctive.

Moreover, nearly all publicly available written communication traditionally has been made in fora that are subject to editorial control and, thus, would not come within the narrow definition of "public forum" articulated in *Lafayette Morehouse* and *Weinberg*. Indeed, most non-Internet-based forms of public communication, including newspapers, magazines, pamphlets, and leaflets, are subject to some form of editorial control. Nothing in the language of the statute or its legislative history suggests that the Legislature intended to exclude this large category of traditional print media from anti-SLAPP protection. Thus, we agree with the court in *Damon v. Ocean Hills Journalism Club, supra,* 85 Cal.App.4th at pages 476–477, that a broad reading of "public forum" "comports with the fundamental purpose underlying the anti-SLAPP statute, which seeks to protect against 'lawsuits brought primarily to chill the valid exercise of constitutional rights' and 'abuse of the judicial process . . . .' (§ 425.16, subd. (a).) This purpose would not be served if we were to construe the statute to make section 425.16, subdivision (e)(3) inapplicable to all newspapers, magazines, and other public media merely because the publication is arguably 'one-sided.' "

■ Finally, we note that in the cyber context, our Supreme Court has held that public *access*, not the right to public *comment*, is the hallmark of a public forum: "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4 [51 Cal.Rptr.3d 55, 146 P.3d 510]; see also *Wilbanks v. Wolk, supra,* 121 Cal.App.4th 883, 895, cited with approval by *Barrett v. Rosenthal* [holding that Web site that did not post information or opinions from other sources was a public forum].) Applying that analysis here compels the conclusion that a newspaper or magazine need not be an *open* forum to be a *public* forum—it is enough that it can be purchased and read by members of the public. Accordingly, we conclude the magazine is a "public forum" within the meaning of section 425.16, subdivision (e)(3).

### B. *Issue of Public Interest*

■ To come within section 425.16, a statement must not only be made in a "place open to the public or a public forum," it must also be made "in connection with an issue of public interest." The company concedes that the statute does not define "public interest," but it contends that the phrase's meaning "is linked to the statute's purpose of promoting participation in matters of public significance." Thus, the company suggests, an issue of "public interest" includes "government matters and private conduct that affect[s] a community in a manner similar to a government entity," but excludes "celebrity gossip." Defendants disagree; they contend that speech concerns a matter of public interest if, among other things, " '[t]he subject of the statement or activity precipitating the claim was a person or entity in the public eye.' "

■ Section 425.16 does not define "public interest," but its preamble states that its provisions "shall be construed broadly" to safeguard "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) The directive to construe the statute broadly was added in 1997, when the Legislature amended the anti-SLAPP statute "to address recent court cases that have too narrowly construed California's anti-SLAPP suit statute." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, p. 2.) Specifically, the legislative history of the 1997 amendment notes that it "was intended specifically to overrule *Zhao v. Wong*[, *supra,* 48 Cal.App.4th 1114]" (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th 1106, 1120) and to adopt the analysis of *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] and *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036 [61 Cal.Rptr.2d 58], which have "construed the statute broadly." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, p. 4; see

also Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, pp. 1, 4.) We therefore look to *Zhao*, *Averill*, and *Braun* to determine the scope of section 425.16 intended by the Legislature.

In *Zhao v. Wong, supra*, 48 Cal.App.4th 1114 (*Zhao*), the plaintiff brought a defamation action alleging that the defendant falsely accused her of murdering the defendant's brother and forging his will. The trial court struck the complaint under the anti-SLAPP statute, but the Court of Appeal reversed, concluding that the matters alleged in the complaint did not concern a matter of "public interest." The court explained that the legislative purpose of the anti-SLAPP statute, as expressed in section 425.16, subdivision (a) is to encourage participation in " 'matters of public significance.' " (*Zhao*, at p. 1120.)[3] That term, the court said, has a narrow meaning, embracing only those matters "occupying 'the highest rung of the heirarchy [*sic*] of First Amendment values,' that is, to speech pertaining to the exercise of demo-cratic self-government." (*Zhao*, at pp. 1120, 1122.) Further, the court said, the Legislature intended the categories of protected activity enumerated in section 425.16, subdivision (e) to be "governed by the restricted scope of the statement of legislative purpose in Code of Civil Procedure section 425.16, subdivision (a)." (*Zhao*, at pp. 1128–1129.) That is, "The very fact that the Legislature included a precisely drafted statement of legislative purpose in the statute manifests an intent that the application of the statute be governed by this statement of purpose." (*Id.* at p. 1129.) It thus concluded that the present suit did not concern a "public issue": "[T]he question whether the statements concerned a matter of public interest cannot be determined on the basis of media coverage, notoriety or potential newsworthiness. . . . [¶] The existence of a public issue depends rather on whether the statements possessed the sort of relevance to self-government that places them in a specially protected category of First Amendment values described in *Connick v. Myers* [(1983)] 461 U.S. [138,] 145 [75 L.Ed.2d 708, 103 S.Ct. 1684]. Though the unusual and intriguing circumstances surrounding Tai-Kin Wong's death and the discovery of a purported holographic will may have been newsworthy, they did not involve a 'public issue' in the sense that we interpret the term." (*Zhao*, *supra*, at pp. 1131–1132.)

 The court rejected *Zhao*'s narrow interpretation of the anti-SLAPP statute in *Braun v. Chronicle Publishing Co., supra*, 52 Cal.App.4th 1036,

---

[3] Prior to 1997, former section 425.16, subdivision (a) stated: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process."

concluding that the Legislature had intended a much more expansive definition of "public issue." There, a University of California medical director sued a newspaper and others for defamation after the newspaper published articles discussing an investigative audit of the medical center that disclosed mismanagement and other improprieties. The trial court struck the complaint under the anti-SLAPP statute and the Court of Appeal affirmed. It explained that *Zhao* had erred in attempting to harmonize the various provisions of section 425.16 by reading an independent "public significance" requirement into the four categories of protected conduct enumerated in section 425.16, subdivision (e). Instead, the court said, because legislative intent is gleaned from the statute as a whole, "the meaning ascribed to the concept of 'public significance' in the preamble must accommodate the singular, clearly defined protected activities set forth in each clause of section 425.16[,] subdivision (e)." (52 Cal.App.4th at p. 1048.) In other words, the court said, to harmonize subdivisions (a) and (e) of section 425.16, "the term 'significance' should be read as simply the meaning or import of a particular matter. Thus a matter has *public* meaning or significance within the language of section 425.16, subdivision (a) because and solely because (1) it occurs within the context of the proceedings delineated in clause one (i.e. 'any statement or writing made before . . . .'); or (2) it occurs in connection with an issue under consideration or review by one of the bodies or proceedings delineated in clause two; or (3) it is an issue of public interest that is aired to the public or in a public forum." (52 Cal.App.4th at p. 1048.) The court thus concluded that the statements alleged in the present suit had "public significance" within the meaning of subdivision (a) because they came within the terms of section 425.16, subdivision (e). (52 Cal.App.4th at pp. 1043, 1048–1049.)

The court adopted a similarly broad view of the anti-SLAPP statute in *Averill v. Superior Court, supra*, 42 Cal.App.4th 1170. There, the defendant was a critic of a plan by a charitable organization to convert a house in her neighborhood into a shelter for battered women. Because of comments defendant made about the organization to her employer, it sued her for slander. (*Id.* at p. 1172.) The Court of Appeal held that the suit was subject to dismissal under the anti-SLAPP statute. It explained that the allegedly slanderous statements arguably fell within the enumerated protected acts under section 425.16, subdivision (e), but that even if the statements were not expressly covered by subdivision (e), the categories enumerated there are not all-inclusive. (42 Cal.App.4th at p. 1175.) The court explained: "The acts in furtherance of a person's right to free speech specified by the statute is preceded by the word 'includes.' The word 'includes' is ordinarily a term of enlargement rather than limitation. [Citation.] The use of 'includes' implies that other acts which are not mentioned are also protected under the statute. [Citation.] . . . Considering the stated purpose of the statute, which includes protection of not only the constitutional right to 'petition for the redress of

grievances,' but the broader constitutional right of freedom of speech, we conclude the Legislature intended the statute to have broad application." (*Id.* at pp. 1175–1176.)

■ Taken together, these cases and the legislative history that discusses them suggest that "an issue of public interest" within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested.* In other words, the issue need not be "significant" to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest. Judged by this standard, the trial court correctly concluded that the statements on which the present suit is based concern an issue of public interest. According to evidence introduced by defendants in support of their motions to strike, there is "extensive interest" in Nygård—"a prominent businessman and celebrity of Finnish extraction"—among the Finnish public. Further, defendants' evidence suggests that there is particular interest among the magazine's readership in "information having to do with Mr. Nygård's famous Bahamas residence which has been the subject of much publicity in Finland." The June 2005 article was intended to satisfy that interest.

Our conclusion about the scope of the anti-SLAPP statute is consistent with two cases cited by defendants in which "tabloid" issues were held to be protected by the anti-SLAPP statute. In *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] (*Seelig*), the plaintiff was one of 50 contestants in the television program *Who Wants to Marry a Multimillionaire* (Fox Network, Feb. 15, 2000). A San Francisco radio show mocked the plaintiff's participation in the show, and the plaintiff sued the radio station for slander and other torts. (*Id.* at pp. 801–806.) The Court of Appeal held that the suit was subject to a special motion to strike. Among other things, it held that the offending comments were made " 'in connection with an issue of public interest' ": "The offending comments arose in the context of an on-air discussion between the talk-radio cohosts and their on-air producer about a television show of significant interest to the public and the media. This program was a derivative of *Who Wants to Be a Millionaire*, which had proven successful in generating viewership and advertising revenue . . . . By having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (*Id.* at pp. 807–808.)

The court reached a similar result in *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226 [83 Cal.Rptr.2d 677]. There, the plaintiff was a nationally known political consultant who had developed advertising campaigns for major political candidates. (*Id.* at p. 230.) He brought a suit for defamation and other torts after the defendant, doing business as Mother Jones, published an article about a custody dispute between Sipple and his

second wife. Among other things, the article discussed Sipple's first and second wives' testimony at the custody trial that he had physically and verbally abused them. (*Ibid.*) The trial court struck the complaint under the anti-SLAPP statute and the Court of Appeal affirmed, holding that the article concerned a matter of public interest. It explained: "Central to the article . . . are the allegations of physical and verbal abuse against a prominent media strategist by two former wives . . . . In 1994, appellant devised media strategy based on gender-based advertising against domestic violence for the gubernatorial races of Pete Wilson in California, George W. Bush in Texas and Jim Edgar in Illinois. Ironically, the custody dispute occurred while appellant was running the media strategy for Bob Dole's 1996 presidential campaign based on morality issues. In other words, appellant was able to capitalize on domestic violence issues in order to further his career." (*Id.* at p. 238.) Accordingly, the court concluded, "[T]he details of appellant's career and appellant's ability to capitalize on domestic violence issues in his advertising campaigns for politicians known around the world, while allegedly committing violence against his former wives, are public issues, and the article is subject to the protection of section 425.16." (*Id.* at pp. 239–240.)

Plaintiffs urge that we should reject the analyses of these cases in favor of those of *Condit v. National Enquirer, Inc.* (E.D.Cal. 2002) 248 F.Supp.2d 945 and *Rogers v. Home Shopping Network, Inc.* (C.D.Cal. 1999) 57 F.Supp.2d 973, 985, footnote 7, but we decline to do so. *Condit* concerned several articles published in the National Enquirer that falsely reported that just days before the disappearance of Chandra Levy, then an intern to Congressman Gary Condit, Condit's wife phoned Levy and "verbally attacked [her]." (248 F.Supp.2d at p. 948.) Mrs. Condit alleged three claims of libel arising out of these articles, and the district court held that her claims were not subject to a special motion to strike. (*Ibid.*) The court reasoned that "California's anti-SLAPP statute applies to the Offending Statements only if they can be characterized as statements made in connection with an issue of public interest for reasons other than that they were made in a widely distributed publication." (*Id.* at p. 954.) The court concluded that the statements about Mrs. Condit were not issues of public interest, as so defined, because Mrs. Condit "is not a public official," Levy's disappearance "does not concern the performance of duties by Mr. Condit in his capacity as a public official," and "[t]he criminal investigation of the disappearance of Ms. Levy is not necessarily a political or community issue in which public opinion and input is inherent and desirable . . . ." (*Ibid.*)

The court's analysis in *Rogers v. Home Shopping Network, Inc., supra,* 57 F.Supp.2d 973, 985, footnote 7, was similar. In dicta, it said: "It is true that California courts have found the public issue or issue of public interest element to be satisfied by speech on many different subjects. [Citations.] However, none of these cases held that celebrity-watching is inherently a

public issue. That a celebrity might be a public figure for purposes of the First Amendment should not mean that all speech about that celebrity is necessarily a public issue or an issue of public interest for purposes of § 425.16(e)."

Initially, we note that we are not bound by lower federal court decisions. (*People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) We also do not agree with plaintiffs that *Condit* and *Rogers* correctly interpret "public interest" within the meaning of section 425.16, subdivision (e). To the contrary, *Condit*'s suggestion that only a "political or community issue in which public opinion and input is inherent and desirable" can be an issue of public interest (248 F.Supp.2d at p. 954) echoes the analysis of *Zhao, supra,* 48 Cal.App.4th at pages 1120, 1122, that issues of public interest are limited to matters "occupying 'the highest rung of the heirarchy [*sic*] of First Amendment values,' that is, to speech pertaining to the exercise of democratic self-government." (*Zhao, supra,* at p. 1122.) The Legislature expressly rejected this limited view of the anti-SLAPP statute when it amended the statute in 1997 and, thus, we will not adopt it here.

## III. *Probability of Prevailing*

" 'In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must " 'state[] and substantiate[] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' ([*Wilson v. Parker, Covert & Chidester* (2002)] 28 Cal.4th [811,] 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], original italics.)" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713–714 [54 Cal.Rptr.3d 775, 151 P.3d 1185].)

For the reasons outlined below, we conclude that plaintiffs have failed to make a prima facie showing of any one of their five causes of action.

### A. *Breach of Contract*

The first cause of action alleges that Timo breached the confidentiality provision of his employment contract with the company by revealing confidential information to the magazine without the company's permission. The

confidentiality provision says: "You acknowledge that, in the course of your consulting contract with the Company, all information acquired by you is confidential to, and the exclusive property of, the Company. You agree not to directly or indirectly, in any manner whatsoever, except for use in the performance of your employment duties, disclose to any person or use at any time either during or after your contract has been renewed or terminated, any information, knowledge or data of the Company or of a third party which has been provided to the Company, unless first obtaining the written approval of Nygård International Partnership. Such information includes, without limiting the generality of the foregoing: methods of doing business; trade and design secrets; financial data as to costs, revenues, prices, profits; market information and sales or customer lists; suppliers and corporate contact names, addresses and telephone numbers; and records pertaining to employees, including their names, addresses and telephone numbers."

 Timo's anti-SLAPP motion asserted that his disclosures did not violate the terms of the confidentiality provision because the published statements attributed to Timo concerned only Timo's personal experiences while working for Nygård, not sensitive economic information such as trade secrets, financial data, customer information, or information about other Nygård employees. We agree. Under the principle of *ejusdem generis* (literally, "of the same kind") (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160 & fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873]; *Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 56, fn. 11 [3 Cal.Rptr.2d 264]), where specific words follow general words in a contract, "the general words are construed to embrace only things similar in nature to those enumerated by the specific words." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 189 [49 Cal.Rptr.3d 169]; see also *International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [64 Cal.Rptr.3d 693, 165 P.3d 488] [doctrine of *ejusdem generis* " 'presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage' "].)[4]

---

[4] The cited cases apply *ejusdem generis* to statutes, but the principle applies equally to contracts. (E.g., *Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1072 [34 Cal.Rptr.3d 136] [applying *ejusdem generis* to interpretation of an insurance contract]; see also 17A Am.Jur.2d (2004) Contracts, § 364, pp. 350–351 ["In contract, as in statutory, construction, the rule is usually applicable that where no intention to the contrary appears, general words used after specific terms are to be confined to things 'ejusdem generis'—of the same kind or class as the things previously specified. Where general words follow the enumeration of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated." (Fns. omitted.)].)

As applied to the present case, the principle of *ejusdem generis* requires that the phrase "*any* information, knowledge or data of the Company" must be construed in light of the kinds of protected information enumerated in the sentence that follows.[5] As Timo correctly notes, all of these examples are of proprietary information or trade secrets. *None* of the information Timo revealed to the magazine is proprietary to the company; instead it concerns Timo's alleged working conditions and Nygård's lifestyle and guests. Nor do we agree with plaintiffs that the identity of celebrity guests entertained by the company's president at his residence is "of the same general nature or class" as the company's confidential trade secrets and proprietary information. Accordingly, we conclude that plaintiffs have not made a prima facie case that Timo's disclosures to the magazine breached the confidentiality provision of the employment contract.[6]

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing and Breach of the Duty of Loyalty

The second cause of action alleges that Timo's disclosures to the magazine violated the implied covenant of good faith and fair dealing, and the fourth cause of action alleges that the disclosures breached Timo's duty of loyalty to the company. Both causes of action are premised on Timo's contractual duty of confidentiality: Plaintiffs assert that Timo breached the implied covenant of good faith and the duty of loyalty by disclosing "information *he agreed* to keep confidential." (Italics added.) Because we have concluded that Timo's disclosures did not breach the express terms of the confidentiality provision of the employment contract, we necessarily conclude that they also did not breach the implied covenant of good faith or the duty of loyalty.

---

[5] Plaintiffs assert that *ejusdem generis* does not apply where contract language is unambiguous, and thus that it has no application here. We do not agree. Unlike the insurance contract at issue in *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969 [46 Cal.Rptr.3d 517], the case on which plaintiffs primarily rely, the relevant contract language here has not been repeatedly interpreted by other courts. (*Id.* at p. 982 [noting cases interpreting "the language of total pollution exclusions identical or substantially similar to that in the policies we are presently considering"].) Moreover, "information" is susceptible of more than one interpretation. Accordingly, to interpret "information" as used in the confidentiality provision of Timo's employment, it is appropriate to consider the kinds of information specifically enumerated.

[6] Because we conclude that Timo's disclosures did not violate his employment contract, we do not reach his alternative contention that, to the extent that the confidentiality agreement purported to preclude those disclosures, it was invalid under Labor Code section 232.5. That section provides, among other things, that an employer may not "[r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions" or "[r]equire an employee to sign a waiver or other document that purports to deny the employee the right to disclose information about the employer's working conditions." (Lab. Code, § 232.5, subds. (a), (b).)

## C. *Interference with Contract*

The third cause of action alleges intentional interference with contract. The elements of intentional interference are: "(1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1239 [132 Cal.Rptr.2d 57].)

We agree with the trial court that plaintiffs failed to make a prima facie showing of intentional interference with contract. Like the causes of action for breach of the implied covenant of good faith and breach of the duty of loyalty, this cause of action is based on Timo's alleged breach of the confidentiality provision of his employment contract: The complaint alleges that the magazine and the publisher interfered with Timo's employment contract by "engag[ing] in a deliberate and/or reckless course of conduct to interfere with Plaintiffs' contractual relationships by unlawfully soliciting Plaintiffs' confidential information in order to defame and otherwise damage Plaintiffs." Because we have concluded that plaintiffs failed to make a prima facie showing of breach of Timo's employment contract, the cause of action for intentional interference with contract necessarily also fails.

## D. *Defamation*

The fifth cause of action is for defamation. It alleges that the June 2005 article was defamatory in that it contained the following descriptions of Timo's working conditions at Nygård International: (1) " 'Timo's horror experiences about Peter Nygård: "I was used!" ' "; (2) " 'Timo slaved—essentially without a break while working for Peter Nygård—I Felt Myself Used!' "; (3) described Timo's " 'horrible working experiences while employed by Peter Nygård' "; (4) asserted that Timo had to " 'endure . . . pestering/taunting round the clock' "; (5) " 'I had to slave/drudge almost without a break the whole time I was at [Nygård's] estate. Apparently he hasn't heard about working hours but rather wanted me to work round the clock' "; (6) " 'Nygård didn't want to let his employees to even go and see a doctor' " when injured; (7) Peter Nygård " 'keeps an eye on his workers like a hawk.' "[7]

Defamation is "a false and unprivileged publication that exposes the plaintiff 'to hatred, contempt, ridicule, or obloquy, or which causes him to be

---

[7] Plaintiffs and defendants have proffered somewhat different translations of the allegedly defamatory portions of the June 2005 article. Where the translations differ, we have relied on the translation offered by plaintiffs.

shunned or avoided, or which has a tendency to injure him in his occupation.' (Civ. Code, § 45.)" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 [64 Cal.Rptr.3d 467]; see also *Taus v. Loftus, supra*, 40 Cal.4th 683, 720 [discussing elements of defamation].) Further, when the plaintiff is a public figure, he or she "must also show the speaker made the objectionable statements with malice in its constitutional sense ' "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." ' (*Reader's Digest Assn. v. Superior Court* [(1984)] 37 Cal.3d [244,] 256 [208 Cal.Rptr. 137, 690 P.2d 610].)" (*McGarry v. University of San Diego, supra*, at p. 114.)

For the reasons that follow, we conclude that plaintiffs failed to make a prima facie showing that the challenged statements were false, as required to establish a cause of action for defamation. Thus, this cause of action fails.

### 1. *None of the Challenged Statements Are "Provably False"*

▮▮▮▮ " 'The *sine qua non* of recovery for defamation . . . is the existence of a falsehood.' (*Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 283 [41 L.Ed.2d 745, 94 S.Ct. 2770].) [¶] The falsehood requirement is grounded in the First Amendment itself. 'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.' (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339–340 [41 L.Ed.2d 789, 94 S.Ct. 2997], fn. omitted; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600–601 [131 Cal.Rptr. 641, 552 P.2d 425].)" (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259–260 [228 Cal.Rptr. 206, 721 P.2d 87].)

To state a defamation claim that survives a First Amendment challenge, thus, a plaintiff must present evidence of a statement of fact that is "provably false." (*Seelig, supra*, 97 Cal.App.4th 798, 809, citing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [111 L.Ed.2d 1, 110 S.Ct. 2695].) " 'Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." [Citations.] Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. [Citations.]' (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [88 Cal.Rptr.2d 843].) The dispositive question after [*Milkovich v. Lorain Journal Co., supra*, 497 U.S. 1,] is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion. (*Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494].)" (*Seelig, supra*, at p. 809.)

To ascertain whether the statements in question are provably false factual assertions, courts consider the " ' "totality of the circumstances." ' " (*Seelig*, *supra*, 97 Cal.App.4th at p. 809.) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Id.* at p. 810.)

In *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1 [20 Cal.Rptr.2d 890] (*James*), the court applied this standard to conclude that plaintiffs could not prove a libel claim because none of the assertedly libelous statements were provably false. There, a criminal defense attorney sued a newspaper and one of its reporters after the newspaper published an article criticizing the attorney's litigation tactics in defense of a man charged with molesting a young girl. (*Id.* at pp. 4–8.) The court acknowledged that the article "undeniably impugned [the attorney's] professional reputation"— indeed, it said, the article suggested that in the opinion of the prosecutor, the victim's father and the columnist, the defense attorney "is a member of a class of lawyers that engages in, and his conduct in this instance is an example of, sleazy, illegal, and unethical practice against which the public should be warned." (*Id.* at p. 12.) Nonetheless, it said, the trial court properly ruled that the column was not libelous as a matter of law. The court explained that the pertinent question "is whether a reasonable fact finder could conclude that the publication as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure James's reputation." (*Id.* at p. 13.) In considering this question, two tests should be applied. First, " 'a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved.' " (*Id.* at p. 13, quoting *Milkovich v. Lorain Journal Co.*, *supra*, 497 U.S. at pp. 19–20.) Second, " 'statements that cannot "reasonably [be] interpreted as stating actual facts" ' " cannot give rise to a cause of action for defamation. (*James*, at p. 13.) " 'This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation. [Citation.]' (*Milkovich v. Lorain Journal Co.*, *supra*, 497 U.S. at p. 20 . . . .)" (*James*, *supra*, at p. 13.)

The court concluded that many of the column's statements fell into the "protected zone of ' "imaginative expression" ' or ' "rhetorical hyperbole" ': [Defense attorney] James's acquisition of the records was a 'really scary part of this story'; in the father's view James went to ' "extreme lengths" '; in [the prosecutor's] view the defense practice he described and criticized was 'a common and sleazy tactic to ruin kids as witnesses' that made him 'angry'; [the prosecutor] is ' "seeing case after case in which the defense goes on a fishing expedition to attack the character of the kid" '; taken as a whole the column was '[a] sad lesson in "justice" '; the columnist wanted readers to '[c]onsider' his column a 'warning.' " (*James*, *supra*, 17 Cal.App.4th at

p. 14.) According to the court, each of these statements "is clearly recognizable as opinion and could not reasonably be understood as a statement of literal fact." (*Ibid.*)

The remaining statements, the court said, "fall somewhere between fact and hyperbole . . . . To determine whether these statements should be regarded as fact or as opinion[, the court] rel[ied] on *Milkovich*'s first test: Do the statements contain *provably false* factual connotation?" (*James, supra,* 17 Cal.App.4th at p. 15.) It concluded that they did not. "The statements that 'when the legal community turns on kids, it doubles their trauma,' and that counsel ' "get[s] hassled all the time by attorneys wanting school records without going through the proper motions," ' contain too many generalizations, elastic terms, and elements of subjectivity to be susceptible of proof or disproof. When does the 'legal community' 'turn on' 'kids'? What is 'trauma' in this context, and how can its increments be measured? What does 'hassled' mean? What are 'the proper motions,' and what is the implication of the fact attorneys do not want to go through them: Beyond 'hassling,' are we to understand that these attorneys would simply take the records without going through the proper motions?" (*Ibid.*) Further, "The columnist's perception that 'the judge has taken a dim view of the defense tactics' is plainly labeled as opinion but arguably implies that the judge has indeed taken 'a dim view.' But what is a 'dim view'? In common parlance it means disapproval or dissatisfaction. But how much or how little of either would suffice to connote a 'dim view'? These matters, again, are not susceptible of proof or disproof." (*Ibid.*) Thus, it concluded, because no reasonable fact finder could have found explicit or implicit false statements of fact, summary judgment was properly granted. (*Id.* at p. 19.)

The court reached a similar conclusion in *Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572 [51 Cal.Rptr.2d 891] (*Campanelli*). There, a terminated university basketball coach brought a libel action against the university and its employees based on statements made to the press after his firing. The trial court sustained the defendants' demurrer, and the Court of Appeal affirmed. (*Id.* at pp. 575–577.) The court explained that because a publication must contain a false statement of fact to give rise to a cause of action for defamation, statements of opinion, even if objectively unjustified or made in bad faith, cannot form the basis for a libel action. (*Id.* at p. 578.) Applying these principles, the court concluded that the vice-chancellor's statement that a player's father " 'felt that . . . [the coach] was putting so much pressure on his son he was making him physically ill' " could not be characterized as statement of fact. (*Id.* at p. 579.) "First, [the vice-chancellor] made clear that the statement did not express his own sentiment, but was something he was told by a parent. Second, the statement was not couched in terms of a factual assertion, but a *feeling* ('Jason Kidd's father *felt* . . . .' [citation]). The very word 'felt' inherently connotes a subjective judgment."

(*Ibid.*) Further, "[p]arents are not generally thought of as experts in the medical field. A statement such as the one attributed to Kidd's father has a much different effect on the reader when made by a parent than if the same statement were uttered by a professional with some expertise in the subject matter. [Citation.] When a parent states that he feels someone or something is making his son sick, the general public would not reasonably expect the parent to be making an observation which could be proven true or false in a medical sense. Yet the objective 'truth' of such a statement is exactly what Campanelli would have a jury decide. Campanelli is not entitled to a jury trial on the issue of whether Kidd's father's 'feeling' about the effect of Campanelli's behavior on his son was empirically sound or medically justified." (*Id.* at p. 580.)

The court similarly concluded with regard to the athletic director's statement to the newspaper that " 'The players were beaten down and in trouble psychologically . . . ,' " which, the coach asserted, amounted to a false charge that he inflicted psychological damage on his players. (*Campanelli, supra,* 44 Cal.App.4th at p. 580.) The court disagreed. "In light of the nature of the controversy and the overall tenor of the article, we cannot conclude the Bockrath statement was intended to be a factual assertion. Bockrath was not seriously maintaining that Cal's players had suffered 'psychological damage' in any scientific, verifiable sense. Instead, the phrase 'in trouble psychologically' was an emphatic way of expressing Bockrath's central theme that he thought the players felt 'beaten down' as a result of Campanelli's harsh methods. The totality of the remarks and the background against which they were made dispel the notion that Bockrath's comment was imbued with the meaning which Campanelli would ascribe to it, i.e., that Cal's players had suffered measurable damage to their psyches, which could be causally attributed to Campanelli. Instead, Bockrath's statement was of the kind typically generated in a spirited dispute between two divergent viewpoints—in short, nonactionable opinion." (*Id.* at p. 581; see also *Ferlauto v. Hamsher, supra,* 74 Cal.App.4th at pp. 1403–1404 [descriptions of plaintiff's motion as " 'stupid,' 'laughed at,' 'a joke,' 'spurious,' and 'frivolous' " are "nothing more than 'the predictable opinion' of one side to the lawsuit"; "the phrases 'creepazoid attorney' and 'loser wannabe lawyer' are classic rhetorical hyperbole which 'cannot "reasonably [be] interpreted as stating actual facts . . ." ' "]; *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1472–1473 [37 Cal.Rptr.3d 133] [statement that plaintiff was " 'virtually stalking and staring down the directors at their regularly scheduled meetings' " are "just the kind of rhetorical hyperbole, epithets, and figurative statements that are nonactionable": "The term 'virtually stalking' cannot

fairly be interpreted as an accusation of a crime but, taken in context, was a metaphor used to describe [plaintiff's] conduct at the board meetings."].)[8]

Applying these principles here, we conclude that the statements on which plaintiffs' defamation claim is based are nonactionable statements of opinion, rather than verifiable statements of fact. No reasonable reader could understand the description of Timo's work experience with plaintiffs as " 'horrible' " and a " 'horror' " to mean that Timo was literally struck with horror while working for the company. Instead, " 'horrible' " and a " 'horror' " colorfully convey Timo's subjective belief that working for the company was unpleasant. His subjective reaction does not contain "provable facts," and no reasonable reader could understand these words as statements of actual working conditions. Timo's statements that " 'I was used!' " and " 'I Felt Myself Used!' " also connote his subjective judgment that working for the company was unpleasant. Further, as in *Campanelli*, Timo's judgment is couched in terms of a "feeling," not a factual assertion. (*Campanelli, supra*, 44 Cal.App.4th at p. 579.) Accordingly, these statements "[are] clearly recognizable as opinion and could not reasonably be understood as . . . statement[s] of literal fact." (*James, supra*, 17 Cal.App.4th at p. 14.)

Most of the remaining statements on which the defamation claim is based also come within the "protected zone of ' "imaginative expression" ' or ' "rhetorical hyperbole" ' ": " 'Timo slaved—essentially without a break while working for Peter Nygård' "; Timo had to endure pestering or taunting " 'round the clock' "; Timo had to " 'slave/drudge almost without a break the whole time [he] was at [Nygård's] estate' "; Nygård " '[a]pparently . . . hasn't heard about working hours but rather wanted [Timo] to work round the clock' "; Peter Nygård " 'keeps an eye on his workers like a hawk.' " As in

[8] The cases plaintiffs rely on do not suggest that rhetorical hyperbole is actionable. Rather, they hold that the use of rhetorical hyperbole does not render inactionable other statements capable of being proven true or false. (E.g., *Edwards v. Hall* (1991) 234 Cal.App.3d 886, 903, 904 [285 Cal.Rptr. 810] [accusation that plaintiff was an "extortionist" is "arguably hyperbolic" but did not "stand[] alone": "Whether Edwards wrongfully demanded $40,000 to either refrain from creating an unfounded controversy or to 'look the other way' is 'sufficiently factual to be susceptible of being proved true or false.' "]; *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1476 [48 Cal.Rptr.2d 235] [assertions that plaintiff "hangs out in sleazy bars" and " 'is broke, had to sell her house in Hollywood, now lives in the worst section' " were actionable notwithstanding the subjective judgments conveyed by "sleazy" and "worst": "The evidence in this case established that Sommer did not frequent bars of whatever nature, was not broke, did not have to sell her house in Hollywood, and did not move, whether to the 'best' or 'worst' part of town. Thus, the statements were indeed proven to be false in their broad sense, so that it did not matter what kind of bars were described or to what part of town she was alleged to have moved."]; *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1270–1271 [20 Cal.Rptr.3d 673] [assertion that plaintiff was " 'extremely rude' " is not defamatory because it does not make a factual assertion capable of being proven true or false; however, statement that plaintiff was not " 'there to help [decedent] but he was there to help himself' " was arguably defamatory because it was capable of being proven true or false].)

*James* and *Campanelli*, no reasonable fact finder could conclude that these statements imply provably false factual assertions. The article did not seriously maintain that Timo was required to work 24 hours each day or that defendants literally enslaved him. Instead, the article's statements that Timo worked " 'round the clock' " and had to " 'slave[] . . . without a break' " were hyperbolic expressions of Timo's belief that he was expected to work unreasonably long hours. Similarly, the statement that Nygård " 'hasn't heard about working hours' " was not intended to suggest that Nygård literally was not familiar with maximum hour limitations. Rather, this statement was a colorful way of expressing Timo's opinion that Nygård was an overly demanding boss. And, no reasonable fact finder could conclude that the article was literally asserting that Nygård watched Timo " 'like a hawk' "; rather, the only reasonable reading of the passage is that Timo believed that Nygård too closely oversaw his employees' work.

One statement remains—that Nygård " 'didn't want to let his employees to even go and see a doctor' " when injured. While this statement arguably could be understood as implying facts capable of being proved true or false, it is not actionable if it discloses all of the statements of fact on which the opinion is based and those statements are true. (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 527 [44 Cal.Rptr.3d 517], citing *Ruiz v. Harbor View Community Assn.*, *supra*, 134 Cal.App.4th 1456, 1471.) We conclude that the statement meets this standard. Immediately after the quoted statement, the article says: "I was installing a large and complicated home theatre system in [Nygård's] house. It had to be completed before the Super Bowl game as Nygård had invited some friends to his house. After having worked round the clock Timo hurt himself falling in the stairs. I lost my balance in the stairs being dead tired. I cut my elbow and realized I needed a doctor. I called Nygård who snorted that work had to be finished first. However, I went to see my boss. After a long talk he gave me permission to see a doctor. He did not show me any kind of sympathy. He just said that he had never had time to see a doctor while he'd been working. Afterwards he scolded me for not having completed the home theatre before the Super Bowl game."

Read in context, it is clear that the statement on which the defamation claim is based—that Nygård wouldn't have liked to allow his employee even to see a doctor—is Timo's opinion based on the incident he describes. The relevant question, then, is whether plaintiffs made a prima facie showing that Timo's factual assertions were false. We conclude that they did not. In opposition to the anti-SLAPP motion, plaintiffs submitted four declarations. Two declarations were submitted by Timo's coworkers; both stated that: "To the extent the article characterizes Plaintiffs or Mr. Nygård as not wanting to let its/his employees see doctors, I find that characterization to be inaccurate. Based on my experience and observation, including my experience and

observations while working in the Nygård Cay Bahamas Resort, Plaintiffs and Mr. Nygård have never prevented or discouraged its/his employees from seeking medical attention." A third was submitted by another coworker who said that based on his experience, denying employees medical attention "does not sound like the behavior Peter Nygård or anyone else acting on behalf of the Nygård Companies would engage in. In fact, in my experience, Mr. Nygård and Plaintiffs have been very accommodating towards the personal needs of their employees." Finally, a fourth was submitted by the employee in charge of arranging medical attention for Nygård personnel; it said that neither plaintiffs nor Nygård discourage employees from seeking medical attention and that she did not recall Timo ever seeing her for the purpose of seeking medical attention.

We conclude that none of these declarations is prima facie evidence that the incident described by Timo did not occur. While each declaration is evidence either that the declarant was not aware of Nygård denying any employee medical attention or that the incident Timo described was not typical of the company's or Nygård's employment practices, none states that he or she witnessed the specific event Timo described. Moreover, if Timo's version of events was inaccurate, plaintiffs could have submitted prima facie evidence of its falsity through the declaration of Nygård. Because plaintiffs did not do so, we conclude that plaintiffs failed to carry their burden of making a prima facie showing of falsity.

## 2. *Defendants' Request for Judicial Notice*

Defendants have asked us to take judicial notice of the recent unpublished decision in *Nygård v. Iltalehti* (June 21, 2007, B192639), which arguably concludes that the Nygård plaintiffs are "public figures." Under United States Supreme Court precedent, where a defamation plaintiff is a public figure, he or she must establish that the allegedly defamatory statements were made with "actual malice"—" ' "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." ' (*Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 256.)" (*McGarry v. University of San Diego, supra,* 154 Cal.App.4th 97, 114.) Defendants contend that the court's conclusion in *Iltalehti* that plaintiffs are public figures collaterally estops plaintiffs from asserting a contrary position here.

Because we have concluded that plaintiffs have not made a requisite showing of falsity, we need not consider whether plaintiffs are public figures or whether the challenged statements were made with actual malice. Accordingly, we deny the request for judicial notice as moot.

## DISPOSITION

The order granting the special motions to strike is affirmed. Respondents shall recover their costs on appeal.

Epstein, P. J., and Manella, J., concurred.