Filed 12/18/19; Opinion following transfer from Supreme Court
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FREDERICK THEODORE RALL III, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> TRIBUNE 365, LLC, et al., <br><br> Defendants and Respondents. | B284566 <br><br> (Los Angeles County Super. Ct. No. BC613703) |

     APPEAL from orders of the Superior Court of Los Angeles County.  Joseph R. Kalin, Judge.  Affirmed.

     Roger A. Lowenstein; Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Plaintiff and Appellant.

     Davis Wright Tremaine, Kelli L. Sager, Rochelle Wilcox, Dan Laidman, Diana Palacios; Jeff Glasser, Los Angeles Times Communications LLC for Defendants and Respondents.

     Jassy Vick Carolan, Jean-Paul Jassy; Nikki Moore and David Snyder, for California News Publishers Association and First Amendment Coalition as Amici Curiae on behalf of Defendants and Respondents.

_____

## SUMMARY

Plaintiff Frederick Theodore Rall III, a political cartoonist and blogger, sued Los Angeles Times Communications LLC (The Times) after it published a "note to readers" and a later more detailed report questioning the accuracy of a blog post plaintiff wrote for The Times. The Times told its readers that it had serious questions about the accuracy of the blog post; that the piece should not have been published; and that plaintiff's future work would not appear in The Times. Plaintiff sued The Times, related entities, and several individual defendants, alleging causes of action for defamation and for wrongful termination in violation of public policy, among other claims.

All defendants filed anti-SLAPP (strategic lawsuit against public participation) motions to strike plaintiff's complaint (Code Civ. Proc., § 425.16). The trial court granted the motions. In our original published opinion filed January 17, 2019, we affirmed the trial court's orders. Plaintiff filed a petition for review with the Supreme Court. The Supreme Court granted review and deferred further consideration pending its disposition in *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*).

After the issuance of its decision in *Wilson*, the Supreme Court, by order dated September 25, 2019, transferred the matter to this court for reconsideration in light of *Wilson*. Having done so, we again affirm the trial court's orders.

## FACTS

We summarize the facts, and then describe the moving and opposition papers. We will elaborate on the facts as necessary in our discussion of the legal issues.

1. **The Plaintiff and the Publications**

Plaintiff is a freelance editorial cartoonist who lives in New York, and is "one of the most widely syndicated cartoonists in the United States." He is the author of 19 books, including a New York Times bestselling comics biography. Between 2009 and 2015, his cartoons were drawn exclusively for The Times, but after his work was published in The Times, he was free to publish it elsewhere. Beginning in 2013, plaintiff also wrote blog posts for publication in conjunction with his cartoons. Plaintiff drew about 300 cartoons and wrote about 150 blog posts for the Times. As of 2013, he was paid $200 for each cartoon and $100 for each blog post. He drew numerous cartoons criticizing the police in general, the Los Angeles Police Department (LAPD) in particular, and then-LAPD Chief Charles Beck specifically.

a. **Plaintiff's May 2015 blog post**

In May 2015, the LAPD was enforcing the city's laws against jaywalking, and The Times reported on the effects of costly jaywalking fines on poor and working class Angelenos. After that report, plaintiff submitted and The Times published a cartoon mocking the LAPD for its jaywalking policy ("LAPD's Crosswalk Crackdown; Don't Police Have Something Better to Do?"), along with a May 11, 2015 blog post that described plaintiff's own arrest for jaywalking in 2001.

In the blog post, plaintiff wrote that he had crossed the street properly ("I was innocent of even jaywalking") when a motorcycle officer "zoomed over, threw me up against the wall, slapped on the cuffs, roughed me up and wrote me a ticket. It was an ugly scene, and in broad daylight it must have looked like one, because within minutes there were a couple of dozen passersby shouting at the cop. [¶] Another motorcycle officer

3

appeared, asked the colleague what the heck he was thinking and ordered him to let me go, which he did.  But not before he threw my driver's license into the sewer."  Plaintiff's blog also stated he had filed a formal complaint with the LAPD, and when he called a few months later, he was told the complaint had been dismissed, and "[t]hey had never notified me."

### b.    The Times's July 2015 "note to readers"

On July 28, 2015, The Times published, in its opinion section, an "Editor's Note[:]  A note to readers."  The note to readers described plaintiff's May 11, 2015 blog post, and then described records that the LAPD provided to The Times about the incident plaintiff had recounted in his blog post.  These included the complaint plaintiff filed at the time, and "[a]n audiotape of the encounter recorded by the police officer."

The note to readers stated the audiotape "does not back up [plaintiff's] assertions; it gives no indication that there was physical violence of any sort by the policeman or that [plaintiff's] license was thrown into the sewer or that he was handcuffed.  Nor is there any evidence on the recording of a crowd of shouting onlookers."  The note to readers continued:

"In [plaintiff's] initial complaint to the LAPD, he describes the incident without mentioning any physical violence or handcuffing but says that the police officer was 'belligerent and hostile' and that he threw [plaintiff's] license into the 'gutter.'  The tape depicts a polite interaction.  [¶]  In addition, [plaintiff] wrote in his blog post that the LAPD dismissed his complaint without ever contacting him.  Department records show that internal affairs investigators made repeated attempts to contact [plaintiff], without success.  [¶]  Asked to explain these inconsistencies, [plaintiff] said he stands by his blog post.  [¶]  As

4

to why he didn't mention any physical abuse in his letter to the LAPD in 2001, [plaintiff] said he didn't want to make an enemy of the department, in part because he hosted a local radio talk show at the time.  After listening to the tape, [plaintiff] noted that it was of poor quality and contained inaudible segments."

The note to readers concluded:  "However, the recording and other evidence provided by the LAPD raise serious questions about the accuracy of [plaintiff's] blog post.  Based on this, the piece should not have been published.  [¶]  [Plaintiff's] future work will not appear in The Times.  [¶]  The Los Angeles Times is a trusted source of news because of the quality and integrity of the work its journalists do.  This is a reminder of the need to remain vigilant about what we publish."

c.    **The Times's August 2015 report reaffirming its decision that plaintiff's blog post did not meet its standards**

On August 19, 2015, in response to questions from readers, The Times published a piece that provided "a detailed look at the matter by Times editors" (the Times report).  After describing the blog post and its note to readers, the Times report stated that plaintiff had "complained that The Times acted unjustly, based on flawed evidence," and "demanded that the paper retract its note to readers and reinstate him as a contributor.  [¶]  In response, The Times has reexamined the evidence and found no basis to change its decision."

The Times report recounted the evidence The Times examined, and makes these principal points.

### i.    Plaintiff's complaint to the LAPD and his later descriptions of the incident

Plaintiff's original complaint to the LAPD, "written days after the jaywalking stop, when the encounter was fresh in his mind," "accused the officer of rudeness but not of any physical abuse."[1]  "In published accounts years later, [plaintiff] added allegations that the officer handcuffed and manhandled him, that a crowd of two dozen onlookers shouted in protest at the mistreatment and that a second officer arrived and ordered his colleague to let [plaintiff] go."[2]

---

[1]    The Times report provided further details of plaintiff's letter of complaint to the LAPD.  Plaintiff stated he had not jaywalked, the officer (Willie Durr) became " 'belligerent and hostile' when [plaintiff] asked him how to deal with the citation," Officer Durr "refused to answer when asked if the ticket could be paid by mail and then threw [plaintiff's] driver's license into the gutter."  Plaintiff asked the LAPD "to consider dismissing Durr, whom he described as 'an ill-tempered excuse for a police officer' " who "exhibited 'vile rudeness.' "  Plaintiff "compared the officer unfavorably to Taliban fighters who [plaintiff] said had detained him briefly while he was on a reporting trip 'near the Afghan war zone.' "  Plaintiff did not accuse the officer "of using force against him or putting him in handcuffs."

[2]    Plaintiff's later accounts (in 2005, 2006, 2009 and the May 2015 blog post) offered varying descriptions of the jaywalking stop.  The Times report described a 2005 column in the Boise Weekly about "pervasive police dishonesty," where plaintiff "cited his jaywalking case as an example, writing that Durr handcuffed and ticketed him even though he had crossed the street legally with a 'walk' signal," saying the LAPD " 'repeatedly ignored my complaints about this unprofessional

6

### ii.    The LAPD records

The Times report recounted that after plaintiff's May 11, 2015 blog post, "the LAPD contacted The Times to challenge [plaintiff's] account."  The LAPD "had investigated [plaintiff's] complaint in January 2002," and provided The Times with plaintiff's letter of complaint about Officer Willie Durr and other documents.  These included "a report by Durr's then-supervisor, Sgt. Russell Kilby, who investigated the allegations; and a log of calls Kilby made in unsuccessful attempts to reach [plaintiff].  [¶] The LAPD also provided a copy of an audio recording of the

---

goon.' "  In a 2006 post on his personal blog, plaintiff "invoked the jaywalking ticket as an example of how police abuse citizens and get away with it:  'An African-American cop cuffed me, threw me up against the wall and roughed me up before writing me a ticket and letting me go.'  [¶]  [Plaintiff] wrote:  'I was polite.  I didn't resist.  I'm not stupid; the guy has the legal right to shoot me.  Anyway, I filed an Internal Affairs complaint.  Guess what happened?  [¶]  If you're black and reading this, you know the answer:  Nada.  Cops get away with murder all the time.' "  In a 2009 column, "headlined 'Everyone hates the cops,' . . . he wrote:  'I admit it:  I don't like cops.'  [Plaintiff] said he couldn't 'point to a single positive experience I've ever had with a cop,' adding that he'd had 'lots and lots of negative ones.' "  Citing his 2001 jaywalking ticket, "[h]e wrote that Durr roughed him up and threw his wallet—not merely his license—into the sewer, and that the officer then 'laughed and zoomed off on his motorcycle.' "  The Times report then points out that plaintiff's 2015 blog post included items that did not appear in the 2005, 2006 and 2009 accounts:  the "crowd of two dozen passersby who shouted at Durr," and the "second motorcycle officer [who] drove up, rebuked Durr and ordered him to let [plaintiff] go."

jaywalking stop made by Durr," as well as a second recording made by Sgt. Kilby "when he called [plaintiff's] phone number and left a voicemail. On the tape, Kilby is heard saying he had left earlier messages to no avail."

The Times report describes Officer Durr's recording. It was "made on a micro-cassette recorder and later transferred to a digital format, runs about six minutes and includes traffic sounds and other background noise. There are extended silences during which Durr said he was checking [plaintiff's] ID and filling out the citation. [¶] A conversation between Durr and [plaintiff] is audible, and it is civil. Durr is not heard being rude, 'belligerent,' 'hostile' or 'ill-tempered,' as [plaintiff] has asserted. The officer is heard calmly answering [plaintiff's] questions. [¶] Neither man is heard to raise his voice at any point. Nor does [plaintiff] express any complaints about how is he [*sic*] being treated. [¶] Early in the encounter, Durr asks [plaintiff] to remove his ID from his wallet. Later, after he has filled out the citation, Durr says: 'I need you to go ahead and sign. . . . You're not admitting guilt.' [¶] Soon after, the officer says: 'Here's your license back.' [¶] About halfway through the recording, faint voices can be heard in the background for about a minute and a half. The comments are unintelligible on the LAPD tape. [¶] The recording ends on a seemingly friendly note. [Plaintiff] appears to ask the officer if he can recommend any restaurants in the area. Durr responds that he is new to the neighborhood and unfamiliar with 'the local eateries.' [¶] Durr is then heard to say: 'All right, have a good day.' "

The Times report indicates that while plaintiff repeatedly wrote that the LAPD ignored his complaint, "[d]epartment records show that investigators looked into his allegations,

8

questioned the officer who ticketed [plaintiff], listened to the recording and tried repeatedly to reach [plaintiff]. Then-Police Chief Bernard C. Parks sent [plaintiff] a letter informing him that an investigation had determined his allegations were unfounded."

### iii. The Times's investigation and plaintiff's explanation

The Times report describes several interviews conducted by Times reporter Paul Pringle in July 2015. Mr. Pringle interviewed Officer Durr, who "said he remembered the encounter because it resulted in a complaint against him and an investigation. [¶] Durr said he had not roughed up [plaintiff] or handcuffed him—in his entire career, he said, he had never handcuffed anyone for jaywalking. Durr also said that no second officer ever appeared on the scene, and that there was no crowd of shouting onlookers. [¶] He said the encounter was free of rancor and he was surprised when [plaintiff] filed a complaint. [¶] [Sgt.] Kilby, now retired, said in a separate interview that his investigation found nothing to support [plaintiff's] allegations. He described Durr as 'a non-problem officer,' 'a nice guy' and 'a hard worker.'"

The Times report recounted that reporter Pringle "contacted [plaintiff] and sent him copies of the documents provided by the LAPD and a copy of Durr's audio recording."

"In two interviews, [plaintiff] told Pringle that he stood by his May 11 blog post and that Durr was lying. He verified that the voice heard on the tape was his but asserted that the recording was of such poor quality that it could not be used to challenge his account. [¶] He said the tape 'only captures a part of what's going on' and that Durr might have been 'muffling' the

recorder at key moments to conceal abusive behavior. [¶] [Plaintiff] said he left his most serious allegations against Durr out of his complaint to the LAPD because he did not 'want it to become a big deal.' [¶] 'I did not want that officer, I did not want the LAPD in general, to feel that I was declaring war against them,' he said."

"[Plaintiff] was asked why he didn't complain to Durr during the encounter about being mistreated. [Plaintiff] said he would never complain to a policeman in such circumstances for fear that the officer might arrest him, 'disappear' him in a jail cell for several days without filing charges, or even kill him. [¶] 'Did I think that guy was going to kill me right there and then?' [plaintiff] said. 'I didn't know. I don't know.' " Plaintiff "said he did not receive any phone message from police," but acknowledged receiving the letter from then-Chief Parks.

The Times report stated that "Pringle also asked [plaintiff] to explain his apparently friendly exchange with Durr after the citation was issued, in which he asked the officer to recommend a restaurant in the area. [¶] [Plaintiff] said he had been 'traumatized' by the incident and likened his behavior to that of 'rape victims calling their rapist back, and—you know, like, days later—and wanting to get back together.' "

The Times report then describes plaintiff's actions after the Pringle interviews and its own further investigative activities. It stated:

"[[P]laintiff] has attacked The Times in Web posts and media interviews, accusing the paper of knuckling under to pressure from the LAPD to discredit a critic." Plaintiff "contend[ed] that the LAPD transcript [was] incomplete and that faintly audible background noises bolster his account. [Plaintiff]

10

said he had Post Haste Digital, a Los Angeles company that does sound work for the entertainment industry, enhance the recording. [Plaintiff] maintains that on the enhanced version, two women can be heard midway through the recording complaining that [plaintiff] was handcuffed. [Plaintiff] said the women were part of a crowd of people who protested his treatment. He has published a transcript that he says is consistent with this claim." He and a co-author "wrote that six unidentified 'audio experts'—including both amateurs and professionals, according to the post—said they believed the recording had been spliced in places."

The Times report states that Commander Andrew Smith, an LAPD spokesman, "said LAPD experts later enhanced the recording and could not hear anyone complain about handcuffs. They found no indication that the tape was spliced or otherwise altered, he said." In addition:

"The Times had the recording analyzed by two leading experts in audio and video forensics." One of these, Edward J. Primeau, "said that voices heard in the background on [plaintiff's] enhanced version are mostly unintelligible, and that he did not detect any mention of handcuffs. He said [plaintiff's] transcript was 'not accurate.'" Mr. Primeau also analyzed the LAPD recording and "concluded 'beyond a reasonable degree of scientific certainty' that the tape had not been spliced or otherwise edited." The second expert, Catalin Grigoras, "said his analysis detected no reference to handcuffs"; that "a man and a woman can be heard speaking in the background at one point, but only a few of their words are intelligible"; they "appear to be having a conversation unrelated to the jaywalking stop"; and

11

" '[i]t is obvious the police officer is not part of that conversation.' "**³**

The Times report concluded by stating The Times "continues to have serious questions about the accuracy of [plaintiff's] blog post"; that "[n]o version of the recording, including [plaintiff's] enhanced one, supports the cartoonist's allegations that Durr was violent, hostile, rude and belligerent"; and that "Goldberg, the editorial page editor, said that in light of all the available information, The Times stands by its note to readers and its judgment that [plaintiff's] May 11 blog post should not have been published."

## 2. The Complaint

On March 14, 2016, plaintiff filed his complaint against The Times, various related companies, and four individual defendants.**⁴** Plaintiff alleged causes of action for defamation, defamation per se, and intentional infliction of emotional distress against all defendants. He also alleged, against the corporate defendants, causes of action for violation of Labor Code section 1050 (blacklisting) and section 1102.5 (retaliation for disclosing information about an employer's violation of law), breach of express oral contract, breach of implied-in-fact contract, and

---

**³** The Times report also describes the background and experience of both experts.

**⁴** These were Austin Beutner (then publisher of The Times), Nicholas Goldberg (editor of The Times's editorial pages), reporter Paul Pringle and Deirdre Edgar (The Times's readers' representative who wrote the introduction to the Times report).

wrongful termination in violation of public policy.  (We refer to the corporate entities collectively as The Times.)

Plaintiff's defamation claims alleged seven "false statements" in the note to readers, and 25 "falsities" in the Times report.  (We recite in the margin the 10 statements plaintiff continues on appeal to assert are "false statements.")[5]  The

---

[5]      In his opening brief, plaintiff contends the following statements are false statements of fact:

  (1)   "Since then, the Los Angeles Police Department has provided records about the incident, including a complaint [plaintiff] filed at the time."

  (2)   "An audiotape of the encounter recorded by the police officer does not back up [plaintiff's] assertions; it gives no indication that there was physical violence of any sort by the policeman or that [plaintiff's] license was thrown into the sewer or that he was handcuffed.  Nor is there any evidence on the recording of a crowd of shouting onlookers."

  (3)   "The tape depicts a polite interaction."

  (4)   "The Los Angeles Police Department challenged [plaintiff's] account and provided documents and a tape recording of the 2001 encounter that indicate the officer did not use force against [plaintiff] and treated him politely."

  (5)   "The Times interviewed [plaintiff] about the discrepancies between the police records and tape recording and his blog post."

  (6)   "About halfway through the recording, faint voices can be heard in the background for about a minute and a half.  The comments are unintelligible on the LAPD tape."

  (7)   "Durr said he had not roughed up [plaintiff] or handcuffed him—in his entire career, he said, he had never handcuffed anyone for jaywalking."

complaint alleged the cited statements are false for various reasons: the LAPD did not provide the records to The Times; The Times "does not actually have the audiotape," but rather an unauthenticated digital copy of the original analog microcassette tape of very poor quality, and subsequent enhancement "confirms [plaintiff's] version of the events, not the LAPD's"; "the evidence was unreliable"; and there are no discrepancies in his accounts of the incident. The complaint also asserts that statements that the recording and other evidence raised "serious questions about the accuracy" of plaintiff's blog post, and that the post "should not have been published . . . necessarily and falsely impl[y] that [plaintiff's] work is of low-quality and lacks integrity."

In addition, the complaint alleged "adverse employment actions and behavior." The complaint alleged plaintiff's hiring "as a freelance editorial cartoonist" in 2009. In addition to facts already described about his experience, his work for The Times, and his blog post, the complaint described his interview with Paul Pringle and telephone calls from Mr. Goldberg. The complaint alleged The Times "did not ask an independent audio expert to authenticate or enhance the recording, or make any effort whatsoever to investigate the LAPD's claims before

---

(8) An LAPD spokesman told The Times that LAPD experts "found no indication that the tape was spliced or otherwise altered."

(9) "[Plaintiff's] accounts of the jaywalking stop have changed over time in significant respects."

(10) "No version of the recording, including [plaintiff's] enhanced one, supports the cartoonist's allegations that Durr was violent, hostile, rude and belligerent."

14

[plaintiff's] termination."  The complaint alleges "egregious conflicts of interest between the LAPD, the Times and its Publisher"; The Times "rushed its decision to terminate [plaintiff] in approximately 24 hours, without following due diligence for allegations of employee misconduct, or the correct handling of audio presented to the newspaper"; and also "failed to follow standard procedure by failing to allow [plaintiff] to meet with the editorial board" to discuss his case.

The complaint sought general and special damages, punitive damages, and attorney fees.

### 3.    The Special Motions to Strike

The Times filed a special motion to strike the complaint, as did the individual defendants.

The individual defendants argued generally as follows. Plaintiff's defamation and emotional distress claims were based exclusively on the content of the notice to readers and the Times report (collectively, the Times articles).  The Times articles involved "allegations of police misconduct, accuracy of reports on that issue, and accountability of those who exaggerate or misrepresent information about police misconduct," all of which are matters of public interest well within the scope of the anti-SLAPP statute.  Plaintiff could not show a probability of prevailing because of the fair report privilege (Civ. Code, § 47, subd. (d)) that applies as a matter of law to all of plaintiff's content-based claims.  In addition, each of the 32 statements alleged in the complaint "is either substantially true; a subjective conclusion based on disclosed facts; and/or not defamatory."

The Times made the same arguments as to plaintiff's defamation and blacklisting claims.  Plaintiff's other claims (the employment claims) also came within the scope of the anti-

15

SLAPP statute, The Times argued, because they arise from The Times's "constitutionally protected editorial decision to stop publishing [plaintiff's] work." In addition, plaintiff's employment claims "presuppose an 'employment' relationship that did not exist." In any event these claims "would fail on the merits because Plaintiff did not plead, and cannot offer evidence to prove, the elements of those claims."

Plaintiff opposed both motions. Plaintiff summarized by stating that "no protected activity forms the foundation of the defamatory statements that effectively wrongfully terminated Plaintiff's employment in violation of public policy." We will elaborate as necessary in connection with our legal discussion, *post*.

The trial court granted both motions.

Plaintiff filed a timely notice of appeal. Along with his opening brief, plaintiff filed a request for judicial notice of portions of an LAPD manual, pages from the docket of a California Supreme Court case, and a decision in a Los Angeles City Ethics Commission case. Plaintiff's request provided no explanation why the materials are relevant to this appeal (violating California Rules of Court, rule 8.252(a)(2)), and did not present them to the trial court despite their availability before the trial court's decision. Accordingly, we deny the request.

After the parties briefed the case, we granted an application from California News Publishers Association and First Amendment Coalition to file a brief as amici curiae in support of defendants.

## DISCUSSION

We first describe the applicable legal principles and then turn to their application in this case.

16

## 1. The Anti-SLAPP Statute and Procedure

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (Code Civ. Proc., § 425.16, subd. (b)(1).) Acts in furtherance of free speech rights in connection with a public issue include, as relevant here, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e)(3) & (4).)

When ruling on an anti-SLAPP motion, the trial court employs a two-step process. It first looks to see whether the moving party has made a threshold showing that the challenged causes of action arise from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the moving party meets this threshold requirement, the burden then shifts to the other party to demonstrate a probability of prevailing on its claims. (*Ibid.*) In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Code Civ. Proc., § 425.16, subd. (b)(2); *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 ["In opposing an anti-SLAPP motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial."].)

17

The anti-SLAPP statute, including the scope of the term "public interest," is to be construed broadly. (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039-1042 (*Nygård*) [discussing cases and legislative history of 1997 amendment adding the directive to construe the statute broadly].) *Nygård* concludes: "Taken together, these cases and the legislative history that discusses them suggest that 'an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Id.* at p. 1042.)

Our review is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

**2.     The Defamation Claims**

**a.     The first prong:  protected activity**

As stated above, written statements in a public forum in connection with an issue of public interest are protected free speech activity. (Code Civ. Proc., § 425.16, subds. (b), (e)(3) & (4).)  Here, plaintiff's defamation claims arose from the Times articles. Both articles were published in a public forum, and both concerned issues of public interest.

The note to readers concerned the accuracy of a blog posted on The Times's website discussing allegations of police misconduct and the propriety of the LAPD policy of enforcing the city's jaywalking laws. The former issue (police misconduct) is always a matter of public interest, and the latter (jaywalking enforcement) had been recently in the news by virtue of The Times's reporting on the effect of $197 jaywalking fines on poor and working class Angelenos, to which hundreds of readers had

18

responded. The accuracy—or not—of publications by The Times on these issues is likewise and necessarily a matter of public interest.

The Times report included the same issues. In addition, when the Times report was published, the issue of The Times's decision to stop publishing plaintiff's cartoons and blog posts, and the claimed defamatory nature of the note to readers, had likewise become issues of public interest as a consequence of extensive media coverage.

*Wilson* involved different facts. The court in *Wilson* found the plaintiff's defamation claim did not arise from a public issue or an issue of public interest. The plaintiff was not a figure in the public eye and the allegedly defamatory statement that he committed plagiarism was privately made and did not contribute to any public debate. Thus, there is no need to reconsider our opinion regarding the defamation claims in light of *Wilson*.

**b. The second prong: probability of prevailing on the merits**

Plaintiff has not produced evidence demonstrating a probability of prevailing on his defamation claims.

**i. The legal requirements**

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; *Nygård, supra,* 159 Cal.App.4th at pp. 1047-1048.)

**ii. The fair report privilege**

Defendants contend, and we agree, that the Times articles were absolutely privileged under Civil Code section 47,

subdivision (d) (section 47(d)).**6**  Under that provision (the fair report privilege), a publication is privileged if it is made "[b]y a fair and true report in . . . a public journal, of (A) a judicial, (B) legislative, or (C) *other public official proceeding, or* (D) *of anything said in the course thereof . . . .*"  (§ 47(d)(1), italics added; see *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 974 (*McClatchy*) ["Even when the print media publish an accurate report of a statement they *know to be false*, the protective cloak of subdivision 4 [now subdivision (d)] remains intact, not penetrated by a finding of malice."]; *Green v. Cortez* (1984) 151 Cal.App.3d 1068, 1074 (*Green*) [the fair report privilege "has been an absolute one" since 1945].)

"The meaning of a 'fair and true report' is well established in California case law. . . .  [A] media defendant does not have to justify every word of the alleged defamatory material that is published.  [Citation.]  The media's responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed.  [Citation.]  Moreover, this responsibility carries with it a certain amount of literary license.  The reporter

---

**6**      Under section 47(d), a privileged publication or broadcast is one made "(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.  [¶]  (2) Nothing in paragraph (1) shall make privileged any communication to a public journal that does any of the following:  [¶]  (A) Violates Rule 5–120 of the State Bar Rules of Professional Conduct.  [¶]  (B) Breaches a court order.  [¶] (C) Violates any requirement of confidentiality imposed by law."

is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a 'fair report.' " (*McClatchy, supra,* 189 Cal.App.3d at pp. 975-976.)

### iii.  This case

Here, the focus of the Times articles was the accuracy of material published on its website, and central to that issue was the 2001 LAPD investigation of plaintiff's complaint to the LAPD about his 2001 jaywalking arrest.  That pivotal issue included the description of the complaint plaintiff made about his jaywalking arrest, the LAPD's investigation of the officer's conduct during the arrest, and the officer's recording of the incident, revealing the differences between the facts found by the LAPD and plaintiff's own version of the incident.  That was a report on a "public official proceeding"—the LAPD's investigation of plaintiff's complaint about his jaywalking arrest.  The reporting on that subject is the basis for plaintiff's defamation claim, without which there would be no claim.  And the authorities are clear that a police investigation is a "public official proceeding" within the meaning of section 47(d).  Thus:

"A police investigation similar to the one in this case [involving an officer's behavior during an arrest] has been held to be an 'official proceeding authorized by law' for purposes of section 47, subdivision 2 [now section 47, subdivision (b)] [citation], and there can be no doubt that such an investigation is similarly a 'public official proceeding' under subdivision 4 [now section 47(d)]." (*Green, supra,* 151 Cal.App.3d at p. 1073; see also *Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128 [*Green*'s interpretation of " 'public official proceeding' to include a police investigation into allegations of use of excessive force by

police" is "consistent with what we construe to be the plain meaning of section 47, subdivision 4 [now section 47(d)]"].)

Ignoring these authorities, plaintiff asserts the LAPD investigation of his complaint was not a "public official proceeding" on the theory that "[t]here was never even a preliminary investigation," and there is no "public official proceeding" until the complainant is interviewed and an "adjudicatory process" begins.  Plaintiff cites no legal authorities that support his assertion.[7]  Instead, he claims that LAPD procedures in its departmental manual were not followed because he was not interviewed.  Plaintiff may not rely on the manual, as

---

[7]	Plaintiff cites cases that do not help him.  For example, in *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 397-398, disapproved on another point in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, footnote 11, the court stated that "[t]he [fair report] privilege has been held to apply to fair reports of police investigations." (*Burrill,* at pp. 397-398.)  It did *not* apply, *Burrill* held, "to a report of the charges made in a citizen's criminal complaint, made by the citizen who filed that complaint, when there is no evidence any official action has been taken with respect to the complaint." (*Id.* at p. 398.)  Consequently, the fair report privilege did not apply to complainant's own defamatory statements in a radio interview, made on the same day he filed his criminal complaint. (*Id.* at pp. 398, 375-376; see *id.* at p. 397 [" 'An important reason for this position has been to prevent implementation of a scheme to file a complaint [in a judicial proceeding] for the purpose of establishing a privilege to publicize its content and then dropping the action.' "].)  This is plainly not such a case.  And, other authorities have declined to follow *Burrill.* (*Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 433-434.)

we have denied his request for judicial notice. The manual would not assist him in any event; it does not purport to tell us (nor could it) what constitutes a "public official proceeding."

Plaintiff also asserts, incorrectly, that the fair report privilege is limited to publication of a verified charge or complaint on which a warrant has been issued. Such publications are also privileged (§ 47(d)(1)(E)), but the limitation plaintiff posits simply does not exist, as the language of the statute shows. (See fn. 6, *ante*.)

Next, plaintiff contends the Times articles were not "fair and true report[s]" of the LAPD files, and were instead "reports of the Times' own intervening investigation." Plaintiff points out that the absolute privilege in section 47(d) does not immunize private investigations, citing *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 280-282 (*Hawran*). *Hawran* is not helpful to plaintiff.

In *Hawran*, a company issued a press release concerning its internal investigation into its handling of certain research and development test data and results. The press release was disseminated on the same day the company filed legally required disclosures to the Securities and Exchange Commission (SEC), and after an SEC investigation had begun. (*Hawran, supra,* 209 Cal.App.4th at pp. 262-263, 264.) The court found the press release did not "purport[] to report on, summarize or describe the SEC proceeding or investigation, the history of the SEC proceeding or investigation, or any communications made 'in the course of' that investigation. Rather, it is plain from the face of the document that the September press release is reporting the results and consequences of [the defendant's] own internal investigation." (*Id.* at p. 281.)

23

That is not the case here.  Both Times articles report fully on the LAPD investigation of plaintiff's complaint.  And the complaint and the information revealed by the LAPD investigation (including the audio recording of the incident), as reported in the Times articles, are at the center of plaintiff's defamation claims.

In a related contention, plaintiff asserts that even if the fair report privilege applies, the privilege "should not reach those portions of the [Times articles] that recount the Times' investigation."  Plaintiff cites no authority for this contention, and we reject it.  We do not think the fair report privilege can be lost by virtue of the inclusion of material that is integral to the subject of the Times articles.  (As plaintiff himself says, "[w]hat actually occurred at the time of [plaintiff's] confrontation with Officer Durr is the crux of the case.")

The authorities support our conclusion.  (See *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 241-242 ["the substantial public concerns implicated in [section 47(d)] support the extension of a broad protection over the media"].) *Sipple* rejected a contention that the fair report privilege "should be applied narrowly and should not shield the entire article but only those statements that are part of the proceedings."  (*Id.* at p. 241.)  The court affirmed the trial court's ruling that statements not a part of the proceeding "did not contain any information to alter the 'gist or sting' of the evidence presented in the judicial proceeding."  (*Id.* at p. 231.)  So it is here, where nothing in the Times articles alters the "gist or sting" of the evidence in the LAPD investigation.

Further, even if we were to find the Times articles could be segregated into portions that are privileged and portions that are

not, it would avail plaintiff nothing.  First, the "false statements of fact" plaintiff describes in his brief (see fn. 5, *ante*) relate in substantial part to the LAPD materials, the report of which is unquestionably privileged.  And second, "[t]o state a defamation claim that survives a First Amendment challenge, . . . a plaintiff must present evidence of a statement of fact that is 'provably false.' " (*Nygård, supra,* 159 Cal.App.4th at p. 1048.)  " 'The dispositive question . . . is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion.' " (*Ibid.*)  None of the remaining statements plaintiff cites, recited in the margin, meets that standard.[8]

---

[8] The allegedly false statements not directly related to the LAPD investigation, along with plaintiff's assertions about them, are:  (1)  "[t]hat the Times interviewed [plaintiff] about discrepancies between the LAPD records, the tape and his blog post."  (Plaintiff says this is false because there were no discrepancies, but clearly there were.)  (2)  "That Officer Durr had never handcuffed anyone for jaywalking."  (Plaintiff asserts Officer Durr has handcuffed a suspect for illegal street racing.)  (3)  "That the LAPD told the Times that the audio has no indication that the tape was spliced or altered."  (Plaintiff says there was no way to determine that because the audio was digital and not the original tape.)  (4)  "That Rall has offered changing versions of the 2001 detention over time and those changes are 'significant.' "  (Plaintiff says there are no changing versions, just "different levels of detail.")  (5)  "That no version of the recording of the 2001 detention . . . supports the allegation that Durr was violent, hostile, rude and belligerent."  (Plaintiff cites as evidence of falsity his declaration describing what he heard a radio talk show host say (which is inadmissible hearsay), and what he heard on his enhanced recording.  Both plaintiff's and The Times's statements are subjective conclusions about what could

25

Next, plaintiff contends his LAPD complaint and related materials were exempt from the fair report privilege by the confidentiality exception to the privilege. (A "communication to a public journal" that "[v]iolates any requirement of confidentiality imposed by law" is not privileged. (§ 47(d)(2)(C).)) Plaintiff misconstrues this exception. Police personnel records of complaints or investigations are indeed subject to various confidentiality restrictions, such as Penal Code section 832.7. But those confidentiality requirements have no application here. Such restrictions are for the protection of investigative files and the police officers involved. The officer "may, of course, choose to waive the confidentiality protection of section 832.7." (*Berkeley Police Assn. v. City of Berkeley* (2008) 167 Cal.App.4th 385, 406, fn. 22.) The LAPD voluntarily provided the investigative files to *both* The Times and plaintiff, and plaintiff points to no evidence that Officer Durr—who was later interviewed by reporter Pringle on the subject—had any objection. Plainly he did not. No confidentiality provision was violated by the Times articles.

Finally, plaintiff asserts that the application of the fair report privilege in this case is a jury issue. Again, we disagree.

Whether a report is "fair and true" is a jury question only if "reasonable minds could disagree as to the effect of the communication on the average reader or listener." (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 98 (*J-M Manufacturing*).) But "appellate

---

and could not be heard.) A reasonable trier of fact could not conclude that any of the cited statements is false or implies "a provably false factual assertion." (*Nygård, supra,* 159 Cal.App.4th at p. 1048.)

courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are insufficient to support a judgment for the plaintiff." (*Id.* at p. 99.) That is the case here.

Both of the Times articles are in the record. So is the material from the LAPD investigation on which the articles report, including a copy of Officer Durr's audio recording. The bottom line, as in *J-M Manufacturing*, is that "[t]he substance of [the Times articles] was accurate," and as a consequence, the Times articles were absolutely privileged under section 47(d). (*J-M Manufacturing, supra,* 247 Cal.App.4th at p. 105.)

We have described the Times articles in great detail, and see no possibility that reasonable minds could disagree on the accuracy of either report. The trial court summed up the point nicely: "The report merely stated the conclusion of the [LAPD] investigation, that [plaintiff's] complaint was unfounded, and reviewed the evidence it was given by the LAPD, which the LAPD used in the investigation, and the logs of attempted communications with plaintiff during the investigation. There is no dispute that the materials reviewed were given to the Times by the LAPD. Plaintiff lacks evidence that the note and article reported falsely on this evidence as received. This is privileged."

In the end, plaintiff's claim that "reasonable minds could disagree on what is fair" rests on his assertion that he disputed The Times's "interpretation" of the audio recording, that his enhancement of the recording "substantially vindicated his

27

position"; and that this court "must assume the validity of [plaintiff's] proof."[9]  That is not the case.

Plaintiff's proof consists of his declaration that he listened to an audio enhancement of the LAPD recording provided to him by Post Haste Digital, and on the enhanced recording he heard remarks by three different women, two of whom referred to handcuffing plaintiff.  That evidence casts no doubt on the accuracy of The Times's report on the evidence that was given to it by the LAPD concerning plaintiff's complaint and its investigation.  Further, the Times report also described plaintiff's version of what he heard on the Post Haste Digital enhancement, and provided an online link to that enhancement so that readers could listen for themselves.  The Times report also described the views of its experts, who examined plaintiff's enhanced version

---

[9]      Plaintiff cites *Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at page 291, for the proposition that we must assume his enhanced recording shows what he says it shows. Plaintiff misses the point.  He cannot establish his case has minimal merit because the Times articles were absolutely privileged as a matter of law, as we discuss in the text.  *Soukup* merely recites the standard principles that in assessing the evidence on an anti-SLAPP motion, the court does not weigh credibility or comparative probative strength of competing evidence.  Rather, in assessing whether the defendant's evidence defeats the plaintiff's attempt to establish evidentiary support for the claim, "it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff.' "  Those principles simply have no application here, where it does not matter what plaintiff's enhanced recording shows; the issue, as we explain in the text, *post,* is whether the Times report was a fair and true report on the evidence given to The Times by the LAPD.

and disagreed with what plaintiff said he heard.  As the trial court aptly concluded, "[p]laintiff has not established that defendants were obligated to find the enhanced tape accurate, credible and audible . . . ."  (Cf. *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156 ["when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment"].)

As the authorities tell us, the fair report privilege " 'does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts.' [Citations.]  [¶]  The 'fair and true' requirement of section [47(d)] therefore does not require a media defendant 'to justify every word of the alleged defamatory material that is published.  The media's responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed.' " (*Dorsey v. National Enquirer, Inc.* (9th Cir. 1992) 973 F.2d 1431, 1436, fn. omitted.)

In sum, we cannot find the Times articles to be anything other than a fair and true report of an LAPD investigation that was central to the substance of the articles, and accordingly absolutely privileged.  Consequently, plaintiff cannot establish a probability of prevailing on his defamation claims.[10]

---

[10]     Plaintiff makes a separate argument that he has established a probability of prevailing on his blacklisting claims. (Under Labor Code section 1050, "[a]ny person . . . who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor."  Section 1054 authorizes a civil action for treble

3. **Plaintiff's Employment Claims**

   a. **The first prong:  protected activity**

The trial court concluded The Times has a First Amendment right to publish or not to publish any story it chooses, and that plaintiff's wrongful termination and related claims arose from The Times's decision not to publish any of his work in the future.  In his initial briefing, plaintiff contended this was error under *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*), and also relied on *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510 (*Hunter*) and the now-reversed Court of Appeal opinion in *Wilson*.  As we explained in our earlier opinion, there was no error.

In his supplemental briefing, plaintiff concedes that, based on "clear language in *Wilson,* [plaintiff] can no longer argue that The Times had failed to meet its prong one burden regarding the employment claims."  We reaffirm our analysis of *Park* and *Hunter*, and briefly describe *Wilson's* definitive resolution of the issue.

---

damages for a violation of section 1050.)  But, aside from any other defects, plaintiff's blacklisting claim arises from the same source as his defamation claims—the Times articles—and is subject to the same limitations.  (See *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1043 ["the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled 'defamation' "].)  As we have found, the Times articles were absolutely privileged.  This eliminates plaintiff's blacklisting claims along with his defamation claims.

In *Park*, the plaintiff was denied tenure at California State University, Los Angeles, and filed suit under the California Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.) for national origin discrimination. The defendant filed an anti-SLAPP motion. The trial court denied the motion because the complaint was based on the defendant's decision to deny tenure, rather than on any communicative conduct in connection with that decision, and denial of tenure based on national origin is not protected activity. (*Park, supra,* 2 Cal.5th at p. 1061.) The Supreme Court agreed with the trial court, and explained:

"[A] claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park, supra,* 2 Cal.5th at p. 1060.)

In this case, unlike *Park*, The Times's decision not to publish plaintiff's work in the future *is* the "wrong" plaintiff complains of in his wrongful termination and related employment claims. It is equally clear that a newspaper's decision to publish or not to publish a contributor's work is protected by the First Amendment.

"[T]he courts have long held that the right to control the content of a privately published newspaper rests entirely with the newspaper's publisher. The First Amendment protects the newspaper itself, and grants *it* a virtually unfettered right to choose what to print and what not to." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1391 (*Eisenberg*);

31

see also *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 258 ["The choice of material to go into a newspaper, . . . and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press . . . ."]; *Ampersand Publishing, LLC v. NLRB* (D.C. Cir. 2012) 702 F.3d 51, 56 ["The First Amendment affords a *publisher*—not a reporter— absolute authority to shape a newspaper's content."].)

In short, we find it incontrovertible that plaintiff's employment claims arose directly from The Times's protected First Amendment conduct: deciding not to publish plaintiff's work. The Times's decision not to publish plaintiff's cartoons and blogs is *not* "just evidence of liability" and it is not "a step leading to some different act for which liability is asserted." (*Park, supra,* 2 Cal.5th at p. 1060.) The decision not to publish *is* the "act for which liability is asserted." (*Ibid.*)

Of course The Times is not free to fire its employees for reasons that are illegal under FEHA or other laws, under the guise of free speech. That is what *Park* is all about. It was the decision to deny tenure for allegedly illegal reasons that was the basis for the plaintiff's suit—not the communicative activity that led up to that decision, and was evidence of the defendant's asserted liability for denying tenure.

Plaintiff's extensive discourse on *Hunter, supra,* 221 Cal.App.4th 1510 has no pertinence for this case either. In *Hunter*, the court concluded that CBS's selection of a weather anchor for its television stations qualified as an act in furtherance of the exercise of free speech. (*Id.* at p. 1521; see

32

*ibid.* [the selections " 'helped advance or assist' [two] forms of First Amendment expression [reporting the news and creating a television show]," and "therefore qualifies as a form of protected activity"]; *id.* at p. 1525 ["CBS's protected activity—employment decisions regarding its weather anchors—is not incidental to [the plaintiff's] discrimination claims; indeed, it is the very conduct on which his claims are based."].)

*Park* discussed *Hunter* in the course of rejecting the defendant university's contention that tenure decisions implicate the public interest as much as decisions concerning who should appear in a news broadcast. (*Park, supra,* 2 Cal.5th at p. 1071-1072.) *Park* did not "express any opinion concerning whether [*Hunter*] itself was correctly decided." (*Park,* at p. 1072.) But in *Wilson*, the Supreme Court cited *Hunter* with approval. (*Wilson, supra,* 7 Cal.5th at pp. 894-896, 889, fn. 7.)

That brings us to *Wilson*. *Wilson* confirms, as plaintiff concedes, that The Times met its burden to show plaintiff's employment claims arose from protected activity. *Wilson* held that the anti-SLAPP statute may apply to employment discrimination and retaliation claims, and those claims are not excluded from the anti-SLAPP statute just because plaintiff alleges an improper motive for defendant's protected activity. (*Wilson, supra,* 7 Cal.5th at p. 881.) Further, *Wilson* tells us, "[d]isciplining an employee for violating . . . ethical standards furthers a news organization's exercise of editorial control to ensure the organization's reputation, and the credibility of what it chooses to publish or broadcast, is preserved. These objectives lie 'at the core' of the press function." (*Id.* at p. 898.) Here, as in *Wilson*, "[t]he staffing decision thus qualifies as 'conduct in furtherance' of [the defendant's] 'speech in connection with' public

33

matter." (*Wilson, supra,* 7 Cal.5th at p. 898, quoting Code Civ. Proc., § 425.16, subd. (e)(4).)  In short, *Wilson* fully supports our analysis.

> **b.    The second prong:  probability of prevailing on the merits**

In *Wilson,* the court did not decide whether the plaintiff's termination claims had the minimal merit necessary to proceed, instead remanding that issue to the Court of Appeal.  (*Wilson, supra,* 7 Cal.5th at p. 899.)  On this point, plaintiff's supplemental brief offers nothing new, based on *Wilson* or otherwise.  We thus have no reason to conclude our original analysis was flawed.

And so we return to a point pertinent to the merits of plaintiff's employment claims:  that The Times is not free to fire its employees for reasons that are illegal under FEHA or other laws, under the guise of free speech.  But absent some illegal basis for the decision, The Times may fire an employee for any reason or no reason.  That is the nature of at-will employment.

The parties argue at length about whether plaintiff was an employee or an independent contractor.  (Plaintiff apparently does not challenge the authorities holding that, because independent contractors are not employees, they lack standing to assert a claim for wrongful termination in violation of public policy.  (E.g., *Sistare-Meyer v. Young Men's Christian Assn.* (1997) 58 Cal.App.4th 10, 14, 18 [independent contractors cannot assert claims for wrongful termination in violation of public policy predicated on race-based terminations].))  Like the trial court, we see no reason to address this issue, because plaintiff in any event has not stated a claim.

To prevail on a claim for wrongful termination in violation of public policy, the employee must show that the public policy allegedly violated is "supported by either constitutional or statutory provisions" and that it is " 'fundamental' and 'substantial,' " among other points. (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890 (*Stevenson*).) Plaintiff made no such showing.

Plaintiff asserts he was "pretextually fired for fabrication, but actually it was in retaliation for offending the police chief." Plaintiff calls this "retaliation by proxy." By this he means that "[t]here was nothing the LAPD could do to harm [plaintiff] directly; so they called in a favor and had the Times fire him." "Retaliation by proxy" is not a legal doctrine, and indeed is not a term that has been used in any California case of which we are aware. More to the point, plaintiff has identified no constitutional or statutory provision that would support his assertion of a public policy violation.

In other words, even if The Times had fired plaintiff "in retaliation for offending the police chief"—a claim that is belied by plaintiff's own evidence that The Times published many of plaintiff's cartoons criticizing the LAPD and Chief Beck—plaintiff has identified no constitutional, statutory or regulatory provision that would have been violated.[11] Without constitutional or

---

[11] In his complaint, plaintiff alleged he was terminated "in part because of plaintiff's protected status" (citing every protected status, including pregnancy, listed in FEHA), as well as Labor Code section 1102.5 (retaliation for disclosing information about an employer's violation of law). He presented no evidence to support those assertions, and does not cite FEHA or Labor Code section 1102.5 in his briefs on appeal.

statutory support for an alleged public policy, a claim for wrongful termination in violation of public policy cannot succeed. (E.g., *Stevenson, supra,* 16 Cal.4th at pp. 889-890.)

Nonetheless, plaintiff purports to have found a case "right on point"—*Ali v. L.A. Focus Publication* (2003) 112 Cal.App.4th 1477 (*Ali*).[12] *Ali* is not on point. In that case, the court reversed a summary judgment for the defendant newspaper on the plaintiff's claim for wrongful termination in violation of public policy. This was because there were triable issues of fact on two issues. One was the independent contractor issue, and the other was "whether his employment was terminated for engaging in protected political speech *outside the workplace*." (*Id.* at p. 1481, italics added.)

In *Ali,* the plaintiff asserted he was fired "not because the content of his articles contravened the editorial policies or standards of the newspaper, but because *outside of the workplace* he publicly criticized an influential public official for supporting a particular political candidate." (*Ali, supra*, 112 Cal.App.4th at p. 1488, italics added.) If true, that would have violated the public policy "prohibiting employers from terminating an employee for engaging in political activity . . . found in Labor Code section 1101." (*Ali,* at p. 1487.)

Obviously, nothing like that happened here, or was alleged to have happened here. The Times did not refuse to publish plaintiff's cartoons and blogs because of his political activity outside the workplace. The Times did so based on plaintiff's own

---

[12]    *Ali* was disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, footnote 7.

work, written for and published on The Times's website.  Even had plaintiff alleged violations of Labor Code sections 1101 and 1102 in his complaint, which he did not, plaintiff cites no authority suggesting those provisions would apply in these circumstances.

Likewise, plaintiff has not established a probability of prevailing on his claims for breach of an express oral contract (or an implied-in-fact contract) not to terminate him without good cause.  His opening brief does not recite the elements necessary to state those claims, and he cites no evidence at all that supports the existence of, or a breach of, any such contract.  Indeed, plaintiff states he "is not even objecting to his at-will status under most circumstances"—whatever that means.

The only evidence plaintiff cites consists of declarations from other cartoonists stating that in similar circumstances, the management of their newspapers "would [have] met about it personally," "would have given me an opportunity to hear and respond to the evidence," would have "offer[ed] me a fair hearing," and "always consulted me before taking any action." Plaintiff says he is "seeking vindication of the policy" in the industry that an employee accused of violating journalistic ethics be given "a fair opportunity to present his position before being fired."  But plaintiff has not produced evidence to establish a prima facie case for the existence of an oral contract with The Times.

Plaintiff presents no argument concerning his claim for intentional infliction of emotional distress, and accordingly any assertion of error on that claim is forfeited.

## DISPOSITION

The orders are affirmed.  Defendants shall recover their costs on appeal.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


STRATTON, J.