Filed 1/20/26  Garcia v. Get Me Out Productions CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JESUS ALEJANDRO GARCIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GET ME OUT PRODUCTIONS, LLC, et al., <br><br> Defendants and Appellants. | B341880 <br><br> (Los Angeles County Super. Ct. No. 24STCV16893) |

APPEAL from an order of the Superior Court of Los Angeles County, Richard L. Fruin, Judge.  Affirmed.

Lavely & Singer, David B. Jonelis and Max D. Fabricant, for Defendants and Appellants.

Noble Attorneys and Michael Chakrian, for Plaintiff and Respondent.

———————————————

Plaintiff and respondent Jesus Alejandro Garcia filed a lawsuit against his former employer Get Me Out Productions, LLC (GMO) and its executives Akim Angelo Anastopoulo and Hali Anatsopoulo.[1]  Garcia brought claims for breach of contract, violations of the Labor Code, and several other employment-related causes of action.  Defendants now appeal from a trial court order denying their special motion to strike the complaint under California's anti-SLAPP statute.  (Code Civ. Proc., § 425.16).[2]  We conclude Garcia's claims do not arise from protected activity, and therefore we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### I.    Garcia's lawsuit

GMO is a film production company.  In December 2022, it hired Garcia as a Senior Vice President of Development and Licensing.  Garcia was tasked with handling "sales and acquisitions of GMO productions."  In addition to a salary and signing bonus, Garcia's employment agreement specified that GMO would pay him a 10 percent commission on "gross funds

---

[1]    Because Akim and Hali share a last name, we refer to them by first name only.  No disrespect is intended.

[2]    All subsequent undesignated statutory references are to the Code of Civil Procedure.

[3]    We take our facts from the complaint and the parties' evidence in support of and opposition to the special motion to strike.  (§ 425.16, subd. (b)(2) [the court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based"].)

that are collected by the Company" for each new client Garcia procured, and a $6,000 monthly advance on his commission.

In October 2023, Garcia contacted SkyShowtime, a European streaming platform, about a documentary called Recipe for a Murder (the Documentary). Over the next few months Garcia worked closely with SkyShowtime to coordinate the project and "secured" cast members for the Documentary.

The production negotiations for the Documentary were finalized in March 2024. The approved total budget was $1,668,863. Thailand Doc LLC, a wholly owned subsidiary of GMO, contracted to provide production services. According to its agreement with SkyShowtime, Thailand Doc would receive a "production fee" of $180,000 for its services.

On March 21, 2024, Garcia spoke to Akim on the phone and asked about his commission. Garcia asserted that the project was "closing for $1.8 million" and therefore his commission would be "around $200,000." Akim responded that Garcia's commission would not be $200,000 because his commission would be based on GMO's net revenue. Garcia asserted that his contract specified that his commission would be based on gross revenue, not net revenue. Akim stated he would review the contract and call Garcia the next day.

On March 25, 2024, Garcia sent Akim an email asserting that he was owed $100,886.40 in outstanding commission payments. Garcia calculated this number by adding together a $1,668,864 "Transaction Value with SkyShowtime" plus certain producer's fees, calculating 10 percent of that sum based on his commission rate, and subtracting the monthly commission advances he had received to date. Akim responded: "If you think that is the way it is, you might as well get another job today. I

3

specifically told you your commission is only based on what the company receives as their fee . . . . The company is only receiving 180k for the entire project. Your commission is 18,000.00."

Later that day, Garcia filed a complaint with the Labor Commissioner's Office alleging that GMO had failed to pay him his full commission.

On March 26, 2024, Akim fired Garcia by email. Akim stated: "After your email yesterday I got a first hand look at how you can just blatantly lie for your own personal gain. No company wants someone working for them that does this."

Garcia asked Akim to mail him a check for his outstanding commission payments plus the cash value of his accrued paid time off (PTO). A GMO representative told Garcia that the company did not owe him any outstanding commission payments. The representative also explained that Garcia had used all his accrued PTO. In response, Garcia provided documentation showing that he had worked from home on the dates that GMO claimed he had used PTO. He also cited GMO policies providing for ten days of PTO and three days of paid sick leave annually, and therefore asserted he was entitled to be paid for a total of 26 PTO and sick days he had accrued in 2023 and 2024.

GMO offered to pay Garcia for 20 PTO days. Garcia's counsel asked GMO to stop contacting Garcia directly, and asserted the matter was governed by state law and "not up for compromise." GMO responded that it would let its attorney handle the dispute.

Garcia filed suit against defendants in July 2024. The complaint brought claims for (1) retaliation for whistleblowing under Labor Code section 1102.5, (2) violation of fundamental public policy under Labor Code section 1197.5, (3) breach of

4

contract; (4) failure to pay for all hours worked, (5) waiting time penalties for failure to pay wages due on termination, (6) failure to provide complete and accurate wage statements, (7) unfair business practices in violation of Business and Professions Code section 17200, (8) conversion in violation of Labor Code section 350 et seq., and (9) scheme to defraud in violation of Labor Code section 219 et seq.

## II.    Defendants' special motion to strike

In September 2024, defendants filed a special motion to strike the entire complaint pursuant to section 425.16.  The motion asserted that Garcia's claims all arise from defendants' "speech and conduct in the creation and production of the Documentary," and that the complaint was a "brazen attempt to silence Defendants' creative voices . . . ."  The motion further argued that defendants' alleged conduct was connected to an issue of public interest because movies are generally matters of public interest.  In addition, the motion contended that Garcia could not demonstrate a likelihood of prevailing on the merits of any claim.

Garcia's opposition argued that his claims were fundamentally based on defendants' refusal to pay out his employment contract, and that those claims "have nothing to do with protected speech" and did not relate to a matter of public interest.  Further, the opposition asserted that Garcia established a probability of success on each cause of action.  Defendants' reply reiterated the points in their motion.

The trial court denied the motion.  It concluded that Garcia's claims did not arise from defendants' exercise of free speech in connection with an issue of public interest.  Rather, the court reasoned that "the *wrongful* and *injury-producing conduct*

5

at the *foundation* of Garcia's claim is Defendants' alleged failure to pay Garcia the disputed sum of commission, PTO, and wage payments in violation of their Employment Agreement, and the termination of Garcia's employment." The court rejected defendants' reliance on case law in which challenged claims were "*directly* founded on either the content or creation of the expressive work *itself*," because Garcia's claims were only incidentally related to defendants' creative work. The court therefore concluded that defendants had failed to satisfy the first step of the anti-SLAPP statute. Defendants timely appealed.

## DISCUSSION

### I.    Legal framework and standard of review

"To combat lawsuits designed to chill the exercise of free speech and petition rights (typically known as strategic lawsuits against public participation, or SLAPPs), the Legislature has authorized a special motion to strike claims that are based on a defendant's engagement in such protected activity. (See Code Civ. Proc., § 425.16, subd. (a).)" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)

Section 425.16, subdivision (e), describes four categories of conduct " 'in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " which are protected by the anti-SLAPP statute. (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.) The sole category relevant in this case encompasses conduct "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

6

The resolution of a special motion to strike under section 425.16 involves two steps. First, the court must determine "whether the plaintiff's claims arise from protected activity." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) At this stage, it is the defendant's burden "to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Ibid.*) If the defendant meets this burden, "for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' " (*Ibid.*)

Our review is de novo. (*Park, supra*, 2 Cal.5th at p. 1067.) "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Ibid.*) We "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not "weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park*, at p. 1067.)

## II. Defendants have not met their burden under the first prong of the anti-SLAPP statute

Defendants assert each claim in Garcia's complaint arises from conduct in furtherance of their "constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) We disagree.

### A. Garcia's claims do not arise from defendants' exercise of free speech

A claim arises from protected activity "when that activity underlies or forms the basis for the claim." (*Park, supra,* 2 Cal.5th at p. 1062.) Defendants primarily argue that Garcia's claims arise from protected activity because they broadly relate to the production of the Documentary, which is itself protected speech. Not so. Garcia's claims for breach of contract, failure to pay for all hours worked, waiting time penalties, and conversion each arise from defendants' alleged refusal to timely pay Garcia the compensation owed under his contract. His claims for failure to provide complete and accurate wage statements, unfair business practices, and scheme to defraud arise from defendants' alleged failure to provide Garcia with information that would have revealed he was not being paid as he expected. And Garcia's claims for retaliation and violation of public policy arise from his termination allegedly in retaliation for his complaints about GMO's failure to fully pay Garcia's commission. In short, Garcia's claims fundamentally arise from an employment dispute; defendants' exercise of free speech does not form the basis for any claim. (*McConnell v. Innovative Artists Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169, 180 ["no one would suggest that a statement or writing firing an employee is protected First Amendment activity"].)

Defendants cite *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, in which a lawsuit based on a dispute over the production of a documentary arose from protected activity. While that case is in some ways factually analogous to this one, it is nonetheless distinguishable. In *Ojjeh*, the plaintiff contracted with and paid the defendants to make a documentary about human rights

8

violations in Syria. (*Id*. at p. 1032.) Nearly two years later, around the time the film was intended to be released, the defendants had produced only short, raw clips. (*Id*. at p. 1033.) The plaintiff sued for breach of contract, fraud, and similar torts, under the theory that the defendants failed to make substantial progress with the documentary and falsely represented that they intended to use the plaintiff's funds to make the film. (*Ibid*.) The trial court denied the defendants' anti-SLAPP motion on the basis that the causes of action did not arise from acts in furtherance of their free speech rights. (*Id*. at p. 1032.) The appellate court reversed, reasoning that the liability-producing conduct was the defendants' inadequate work on the documentary, which is itself protected activity. (*Id*. at pp. 1037–1038.)

Like in *Ojjeh*, Garcia entered into a contract with the defendants to produce media, including a documentary, and the parties later came to dispute that contract. But the mere fact that a dispute relates to a creative endeavor does not mean it falls within the anti-SLAPP statute. Rather, we must determine whether protected activity "underlies or forms the basis for" Garcia's claims. (*Park*, *supra*, 2 Cal.5th at p. 1062.) As we have discussed, Garcia alleged that defendants failed to pay him as required under a contract, engaged in unfair and fraudulent conduct to hide that he was not being fully paid, and retaliated against him for complaining about his pay. Unlike in *Ojjeh*, none of this liability-producing conduct arises from defendants' protected activity.

Defendants also contend that Garcia's claims arise from their "subjective decision to terminate him once it was clear that his continued services were frustrating Appellants' ability to get

9

the Documentary made and its message heard."  This argument runs parallel to one that our high court addressed and rejected in *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*). In *Wilson*, defendant CNN fired a story producer after discovering he may have engaged in plagiarism.  (*Id.* at p. 882.) The producer sued CNN for retaliation and other claims.  In its anti-SLAPP motion, CNN argued "that its decisions to hire or fire writers and other content producers categorically qualify as conduct in furtherance of its speech rights."  (*Id.* at p. 894.)  Our high court disagreed, explaining:  "Not every staffing decision a news organization makes—even with respect to those who write, edit, or otherwise produce content—enjoys constitutional protection. . . .  It follows that, also as a general rule, a legal challenge to a particular staffing decision will have no substantial effect on the news organization's ability to speak on public issues, which is the anti-SLAPP statute's concern."  (*Id.* at p. 896.)  Therefore, an anti-SLAPP movant asserting that it terminated an employee in furtherance of its free speech rights "has the burden of showing [the plaintiff's] role bore such a relationship to its exercise of editorial control as to warrant protection under the anti-SLAPP statute."  (*Ibid.*)

Defendants have failed to make such a showing here. Garcia allegedly coordinated sales and acquisitions for GMO. There is no evidence supporting that Garcia had "editorial control" over the Documentary or any other project.  (*Wilson*, *supra*, 7 Cal.5th at p. 896.)  Defendants point to allegations that Garcia was " 'instrumental' " to the development of the Documentary, and that he "secured" certain cast members for it. But these allegations are consistent with Garcia's role, which, according to Akim's declaration, was "to handle the sales and

acquisitions of GMO productions." There is no evidence that Garcia selected the actors, wrote the script, or otherwise exercised creative control over the Documentary. On these facts, GMO's decision to terminate Garcia, "without more, falls outside the reach of the anti-SLAPP statute." (*Id*. at p. 897.)

Defendants also cite *Norman v. Ross* (2024) 101 Cal.App.5th 617 for the proposition that a breach of contract claim relating to the distribution of a television show may arise from protected activity. *Norman* is distinguishable, however, because the allegations necessarily were based on protected conduct. Specifically, in *Norman*, the plaintiff brought a *Desny*[4] claim for breach of an implied-in-fact contract based on an idea submission. (*Id*. at p. 648.) One required element of a *Desny* claim is that the defendant "found the [plaintiff"s] ideas valuable and *actually used* them." (*Ibid*.) The plaintiff in the case alleged that this use occurred in the production of a television show, which is protected activity. (*Ibid*.) But Garcia did not submit any idea to defendants and did not bring a *Desny* claim against them. More broadly, unlike in *Norman*, defendants do not argue that any specific element of Garcia's claims relies on defendants' activities in furtherance of their protected speech. (Cf. *Wilson*, *supra*, 7 Cal.5th at p. 892 ["[i]f conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the anti-SLAPP analysis has been carried"].)

We also reject defendants' assertion that their motion should have succeeded because Garcia's " 'actual objective' " is to " 'interfere with *and burden*' " their free speech. (*Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th

---

4        *Desny v. Wilder* (1956) 46 Cal.2d 715.

11

1050, 1064.) Defendants cite no evidence to support this claim, and we see nothing in the record to support it.[5]

## B. *Defendants have not established that Garcia's claims relate to a matter of public interest*

Even if Garcia's claims arose from GMO's speech, defendants have not established that the claims implicate any matter of public interest. (§ 425.16, subd. (e)(4).) "[A]bsent unusual circumstances, a garden-variety employment dispute concerning a nonpublic figure will implicate no public issue." (*Wilson*, *supra*, 7 Cal.5th at p. 901.) Defendants do not argue that Garcia was a public figure, and they have identified no unusual circumstances here that would transform the parties' private employment dispute into a matter of public concern.

---

[5] Defendants also rely on *Rall v. Tribune 365 LLC* (2019) 31 Cal.App.5th 479, transferred for reconsideration. Our Supreme Court granted review in *Rall* and ultimately transferred the case back to the appellate court for reconsideration in light of *Wilson*, *supra*, 7 Cal.5th 871. After reconsideration, the appellate court published a second opinion, but our high court denied review and ordered that the second opinion not be published. Because the final disposition in *Rall* is unpublished, neither defendants nor this court may rely on it. (Cal. Rules of Court, rule 8.1115.)

In any case, even assuming defendants' briefing accurately describes *Rall*, we would find it distinguishable. According to defendants, *Rall* held that "a newspaper's creative decision to no longer work with an unreliable contributor and no longer publish the contributor's work was constitutionally protected activity . . . ." Garcia did not create any content that defendants chose to no longer publish, and therefore *Rall* does not support any argument that defendants' decision to terminate him constituted protected activity.

12

Instead, defendants contend that Garcia's claims relate to a public issue simply because GMO produces documentaries. But as we have discussed, Garcia's claims do not arise from any action or statement specifically relating to the Documentary— they stem from the dispute over his compensation and the circumstances of his termination. (*Wilson*, *supra*, 7 Cal.5th at p. 901 [statements about employee's termination which tangentially referenced a matter of public interest were not made in connection with a public issue].)

Because defendants have not met their burden of establishing that Garcia's claims arise from protected activity, we need not address the parties' arguments as to whether Garcia's claims have minimal merit.

## III. Garcia has not identified egregious conduct sufficient to warrant sanctions

Finally, we deny Garcia's motion for sanctions. Sanctions should be "sparingly applied" to penalize "the most egregious conduct without deterring valid appellate claims." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649.) Garcia contends sanctions are appropriate because defendants' appeal is frivolous, i.e., because "any reasonable attorney would agree that the appeal is totally and completely without merit." (*Id*. at p. 650; § 907; Cal. Rules of Court, rule 8.276(a)(3).) We disagree that defendants' appeal indisputably lacks merit. GMO is in the business of producing movies. Under different circumstances, a retaliation lawsuit by a former employee could arise from GMO's acts in furtherance of its First Amendment rights. (Cf. *Wilson*, *supra*, 7 Cal.5th at p. 896 [termination of employee may bear "such a relationship to [employer's] exercise of editorial control as to warrant protection under the anti-SLAPP statute"].) We also

13

reject Garcia's contention that the appeal is moot, and therefore lacks merit, because the Documentary has now been released. Even after its release, there could remain a live controversy as to whether defendants were acting in furtherance of free speech rights when they terminated Garcia. (*Ibid.*)

Garcia also argues that sanctions are warranted because defendants supposedly misrepresented the record. (Cal. Rules of Court, rules 8.276(a)(4) [court may award sanctions for unreasonable violations of the California Rules of Court]; 8.204(a)(1)(C) [appellant's burden is to support arguments with citations to the record].) The first two statements Garcia challenges merely reflect competing interpretations of Garcia's employment contract. The third challenged statement is a declaration in which Akim asserted that GMO had not yet been paid for the Documentary as of September 2024. Garcia argues GMO should have been paid by February 2025, but that is not inconsistent with Akim's declaration.

## DISPOSITION

The order denying defendants' special motion to strike is affirmed.  Garcia is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.


We concur:


EGERTON, Acting P. J.


ADAMS, J.

15